Argued and submitted November 3, 2009, decision of Court of Appeals and
judgment of circuit court affirmed April 1, 2010

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## BENSON L. HOGEVOLL,
*Petitioner on Review.*

(CC 055715; CA A134536; SC S057014)

228 P3d 569

Jesse Wm. Barton, Salem, argued the cause and filed the brief for petitioner on review.

Denise G. Fjordbeck, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

GILLETTE, J.

## GILLETTE, J.

This criminal case arose out of a 2005 second-season coast bull elk hunt. Defendant shot and hauled from the field an elk for which he had a tag, but he also took possession of a second elk for which he did *not* have a tag, which someone also had shot and killed. Defendant was charged by a "Uniform Fish/Wildlife Citation and Complaint" with "exceeding bag limit on coast bull elk." At defendant's trial, the trial court refused to give a special instruction that defendant requested, which would have told the jury that, to be guilty of "exceeding [the] bag limit," defendant would have to be found to have personally and knowingly killed both elk. The trial court instead gave an instruction, to which defendant excepted, to the effect that, to find defendant guilty of "exceeding the bag limit," the jury must find that he "took" more than one elk. The jury found defendant guilty. He appealed his conviction, arguing that the trial court had erred in both respects. A divided Court of Appeals affirmed. *State v. Hogevoll*, 223 Or App 526, 196 P3d 1008 (2008). We allowed defendant's petition for review and now affirm.

Because this is a case involving jury instructions, we state the facts in the light most favorable to defendant. *See State v. Oliphant*, 347 Or 175, 178, 218 P3d 1281 (2009) (court views evidence in light most favorable to establishment of facts necessary to require giving requested instruction). Defendant was hunting on his own property for a second-season coast bull elk. He wished to shoot a particular elk with five-point antlers that was grazing in a field with a number of other elk. Defendant fired at the chosen elk twice before it collapsed. After waiting for some time, defendant approached the elk, put his tag on it, and gutted it, which took about half an hour. On the way to retrieving his vehicle to haul the elk out of the field, defendant saw a bull elk with seven-point antlers lying dead in a ditch. Defendant testified, "I figured at the time that I screwed up, that I somehow shot that elk, that seven-point."

Defendant did not have a second elk tag. He nevertheless hauled the seven-point elk to his residence and then gave it to a neighbor who had a valid elk tag. Defendant explained to the neighbor that he thought that he had shot

through the five-point elk and into the seven-point elk, and that he was giving the elk away because he wanted to continue hunting. Defendant later retrieved the five-point bull elk, dressed it, and refrigerated it.

The matter came to the attention of the state police, which investigated. Defendant initially told the investigator that he believed that he had shot the five-point elk twice, but that one of the bullets had passed through, striking the seven-point elk. Defendant acknowledged that he should have tagged just one elk and called the state police about the second one. Defendant also stated to the investigator that he did not call the authorities because he wanted the meat to go to "somebody that might enjoy it and utilize it." A few days later, defendant changed his theory about what had happened and told the investigator that he did not know how the second elk was killed.[1] As noted, the state, by a Uniform Fish/ Wildlife Citation and Complaint, charged defendant with exceeding the bag limit on coast bull elk (*former* OAR 635-065-0001 (2005)).[2]

At trial, defendant requested a jury instruction that, to exceed the bag limit, a person must *knowingly kill* more than one elk in a single season.[3] The trial court declined to give the requested instruction and, instead, instructed the

[1] The change of mind may have been prompted by the neighbor who received the seven-point elk opining to defendant that the location of the bullet holes cast doubt on defendant's responsibility for killing the seven-point elk.

[2] Defendant acknowledges that *former* OAR 635-065-0001(2) (2005) incorporated by reference the 2005 *Oregon Big Game Regulations*, making a violation of the 2005 *Big Game Regulations* also a violation of *former* OAR 635-065-0001. Defendant further acknowledges that, by virtue of the provisions of ORS 496.992(1), such a violation becomes a Class A misdemeanor.

[3] Defendant requested the following instruction:

"Oregon law provides that a person commits the crime of exceeding the bag limit of coast bull elk if that person knowingly kills more than one coast bull elk in one season[.]

"In this case, to establish the crime of exceeding the bag limit of coast bull elk, the state must prove beyond a reasonable doubt the following three elements:

"a. The act occurred in Lincoln County[,] Oregon.

"b. The act occurred on or about November 22, 2005.

"c. [Defendant] knowingly killed more than one coastal bull elk in the second season for coastal bull elk."

jury that a person exceeds the bag limit on coast bull elk by *taking* more than one elk.[4] Defendant excepted to that instruction. As noted, the jury ultimately found defendant guilty, and defendant appealed, assigning error both to the trial court's refusal to give the jury instruction requested by defendant and to the court's instruction to the jury that defined the crime using "to take" as the operative verb.[5] Also as noted, a divided Court of Appeals affirmed. *Hogevoll,* 223 Or App 526.

■     "In determining whether it was error to give a particular instruction, we read the instructions as a whole to determine whether they state the law accurately." *State v. Woodman,* 341 Or 105, 118, 138 P3d 1 (2006). Defendant disputes neither that he took from the field and processed two elk, nor that he possessed only one elk tag when he did so. Defendant asserts, however, that, under Oregon law, one does not commit the crime of exceeding the bag limit for coast second-season elk unless one knowingly *kills* more elk than the law and regulations authorize; by contrast, he asserts, merely *taking possession of* an already dead animal does not violate the rule under which he was prosecuted.

Defendant correctly points out that neither *former* OAR 635-065-0001 (2005),[6] nor the 2005 *Oregon Big Game*

---

[4] The trial court instructed the jury:

" 'Take' means to kill or obtain possession or control of any wildlife.

"* * * * *

"The * * * charge against [defendant] is Exceeding the Bag Limit on Coast Bull Elk.

"Oregon law provides that a person commits the crime of Exceeding the Bag Limit of Coast Bull Elk if that person knowingly takes more than one coast bull elk in one season.

"In this case, to establish this charge beyond a reasonable doubt, the State must prove * * * that the Defendant knowingly took more than one Coast elk * * * in one season * * *.

"And again, the word 'took' * * * has the same * * * definition as the word 'take' that I've already * * * read to you."

[5] Defendant did not (and does not) assign error to the form or content of the charging instrument—in this case, the Oregon Uniform Fish/Wildlife Citation and Complaint. It follows that the only issues before this court concern the jury instructions, whether given or refused.

[6] *Former* OAR 635-065-0001(2) (2005) provided:

"OAR chapter 635, division 065 incorporates, by reference, the requirements for hunting game mammals set out in the document entitled '[2005]

*Regulations* that are incorporated by reference in that rule, expressly define the phrase "bag limit." Defendant argues that the phrase is ambiguous and that its meaning is best understood by considering the definition of a "tag."

Defendant's reasoning, as we understand it, is this: A "tag" is required to hunt elk legally. *See* OAR 635-045-0002(68) (tag is document authorizing "taking" of designated kind of mammal at specified time and place); OAR 635-065-0015(1) (any person hunting game mammals, for which tag is required, must have on his or her person valid tag for dates, area, and species being hunted); OAR 635-045-0002(68) (defining "tag" as document authorizing taking of designated kind of mammal at specified time and place); and OAR 635-065-0015(5)(c) (person may possess only one valid coast second-season elk tag). Defendant then reasons that, because all the references to "tags" for elk are related to hunting with a weapon,[7] only those animals that are *killed* by a hunter may be counted toward the bag limit. We are not persuaded.

In construing an administrative rule, we apply the same analytical framework that applies to the construction of statutes. *See Osborn v. PSRB*, 325 Or 135, 145-46, 934 P2d 391 (1997) (citing *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993)). At the first level of analysis, we examine the text and context of the rule to discern the intent of the agency. *Marshall's Towing v. Department of State Police*, 339 Or 54, 62, 116 P3d 873

---

Oregon Big Game Regulations,' into Oregon Administrative Rules. Therefore, persons must consult the '[2005] Oregon Big Game Regulations' in addition to OAR chapter 635, to determine all applicable requirements for game mammals."

[7] *See, e.g.*, OAR 635-065-0015(1) ("any person hunting game mammals for which a tag is required must have on their person a valid tag for dates, area and species being hunted"); *see also* 2005 *Big Game Regulations* at 13 ("No person shall: Hunt with a centerfire * * * rifle without a valid, unused * * * elk tag for that time period and area on that person during * * * coast bull elk seasons; * * *; [t]he owner of a game mammal tag that kills a game mammal for which a tag is issued, shall immediately remove in its entirety only the month and day of kill and attach the tag in plain sight securely to the game mammal * * *."); *id.* at 74 ("You may only hunt one of the elk seasons listed on this page. Make sure you purchase or redeem the correct tag for the season you want to hunt prior to the earliest hunt date."); *id.* at 76 ("It is unlawful to hunt with a centerfire * * * rifle without a valid, unused elk tag * * * during * * * [c]oast bull elk centerfire firearm seasons.").

(2005). As is true with respect to a statute, terms of common usage within the text of a rule generally should be given their plain, natural, and ordinary meaning unless specifically defined or used in some other way. *See State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006) ("Absent a special definition, we ordinarily would resort to dictionary definitions, assuming that the legislature meant to use a word of common usage in its ordinary sense."). With that process in mind, we turn to the term at issue.

■     As noted, no rule defines the phrase "bag limit," although its actual definition in the context of this case is not subject to serious question. The 2005 *Oregon Big Game Regulations* provided, at 75, that the "bag limit" for the hunt in which defendant was engaged was "one bull elk with visible antler." Footnote one directs the reader to look to the preceding page, 74, to find the pertinent "bag limit definitions." Text within a box on that preceding page contains the following statement:

"ELK BAG LIMIT DEFINITIONS:

"* * * * *

"Bull elk = Bull elk with at least one visible antler."

The foregoing suggests that the phrase "bag limit" is simply a shorthand way of referring to the number of animals that lawfully may be taken by a hunter during a particular hunting season. Dictionary definitions support that understanding. *Webster's Third New Int'l Dictionary* 162 (unabridged ed 2002), defines "bag limit" as "the maximum number of fish or game animals permitted by law to be taken by one person in a given period." As a noun, "bag" is defined, in part, as:

"**4** : something that is bagged: as * * * **b** : a quantity of game taken during a particular hunt or during a particular period usu. by one person ‹the ~ included an elephant, and a magnificent male tiger›; *often* : the amount of game permitted (as by law) to be taken by one hunter ‹he got his ~ early and was home before lunch› **c** : something likened to the bag taken by a hunter or fisherman esp. in being won, captured, seized or otherwise taken by personal effort[.]"

*Id.* As a verb, "bag" is defined, in part, as

> "**3 a** : to take (animals) as game : to kill or capture (game) ‹he bagged a fine 10-point buck› **b** : to get possession of esp. by strategy or stealth."

*Id.*

As is apparent from those dictionary definitions, the plain understanding of "bag limit" does not confine that concept to animals *killed* by a hunter, but also includes animals otherwise *taken* by a hunter during an authorized hunt. And, in contrast to the absence of a definition of "bag limit," an Oregon statute does expressly define the term "take." That term means "to kill *or* obtain possession or control of any wildlife." ORS 496.004(16) (emphasis added).

A number of other statutory provisions provide further context—assuming more were needed—for ascertaining the meaning of "bag limit." Most importantly, ORS 498.002 declares wildlife to be the property of the state and prohibits "taking" or "possessing" any wildlife in violation of the wildlife laws or regulations.[8] ORS 496.162 sets forth the criteria for the State Fish and Wildlife Commission's determination of the number of elk that may be "taken" annually—a number that translates into the number of tags that can be issued. The statute also expressly utilizes the term "hunting" as only *one* of the methods by which elk may be "taken."[9] Finally, ORS 497.075 prohibits "taking" game without a valid

---

[8] ORS 498.002(1) provides:

"Wildlife is the property of the state. No person shall angle for, take, hunt, trap or possess, or assist another in angling for, taking, hunting, trapping or possessing any wildlife in violation of the wildlife laws or of any rule promulgated pursuant thereto."

[9] ORS 496.162 provides, in part:

"(1) After investigation of the supply and condition of wildlife, the State Fish and Wildlife Commission, at appropriate times each year, shall by rule:

"(a) Prescribe the times, places and manner in which wildlife may be *taken* by angling, *hunting, trapping* or *other method* and the amounts of each of those wildlife species that may be taken and possessed.

"* * * * *

"(4) In carrying out the provisions of this section, before prescribing the numbers of deer and elk to be *taken* * * *."

(Emphasis added.)

license, *tag* or a permit to do so.[10] Thus, the systematic use of the expressly defined term "take," coupled with the designation of "hunting"[11] as only one of the methods of "taking," makes it clear that the legislature did not intend to restrict the methods by which the limits of a "bag" can be reached to shooting and killing alone. It follows that a person may be in possession of more elk than permitted by the "bag limit," even if that person has not intentionally killed each animal. It is sufficient that a person's "bag" exceeds the legal "limit" and that the person is aware of how many animals he or she possesses.

Defendant contends that such a broad construction of the term "bag limit" would criminalize conduct that the Commission intended to make lawful—for example, possession of a found or road-killed animal with the permission of the state police. However, that contention is answered by directions contained in the 2005 *Oregon Big Game Regulations*. That document requires that a person finding a dead animal notify the state police; it does not authorize the state police to permit a private person (and still less a person who already had shot another elk) to take possession of a carcass or to make a decision respecting how to dispose of it. *Id.* at 13. Had defendant notified the police on finding the second elk, the meat would have been donated to a charity or otherwise appropriately disposed of. *See* OAR 635-002-0005 (so stating).[12] Thus, defendant's assertion (which echoes the dissent in the Court of Appeals) that our construction of the

---

[10] ORS 497.075(1) provides:

"Except as provided in subsections (2), (3) and (4) of this section, no person shall angle for, take, hunt or trap, or assist another in angling for, taking, hunting or trapping, any wildlife unless the person has in possession such valid licenses, tags and permits therefore as the State Fish and Wildlife Commission issues."

[11] To "hunt" is to "take or attempt to take any wildlife by means involving the use of a weapon or with the assistance of any mammal or bird." ORS 496.004(10); OAR 635-045-0002(68).

[12] OAR 635-002-0005 provides:

"Carcasses of edible wildlife, except black bear, shall be disposed of in the following manner:

"(1) Donated to public and charitable institutions such as welfare organizations, churches, and others provided the receiving agency pays all storage and handling charges and does not sell the meat.

term "bag limit" would or could lead to an absurd result—the carcasses of edible wildlife going to waste—is not well taken.

It follows from the foregoing that defendant's requested instruction was not a correct statement of Oregon law. The trial court thus did not err in refusing to give it. And, because defendant's objection to the instruction that the trial court did give was based on the same erroneous theory, the trial court also did not err in giving that instruction. The Court of Appeals decision affirming the trial court in both respects was correct.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

"(2) Donated to persons determined to be eligible because of low income or medical reasons, provided the eligible person requests and accepts the carcass as delivered, consumes the meat at his/her place of residence, and does not offer it for sale.

"(3) Donated to wildlife rehabilitators licensed by the Department provided those rehabilitators use the meat to feed sick, injured or orphaned wildlife and do not sell the meat.

"(4) Donated to rendering plants, pet food manufacturers or disposed of as specified by personnel of the Department."