Argued and submitted February 7, 2013, affirmed October 15, 2014

## Robert E. KRAAI,
*Plaintiff-Respondent,*

*v.*

## BUREAU OF FIRE AND POLICE DISABILITY & RETIREMENT FUND,
*Defendant-Appellant.*

Multnomah County Circuit Court
110201476; A149516

339 P3d 86

Franco A. Lucchin, Deputy City Attorney, City of Portland Bureau of Fire and Police Disability and Retirement Fund, argued the cause and filed the briefs for appellant.

Nelson Robert Hall argued the cause for respondent. With him on the brief were Christine Moore and Bennett, Hartman, Morris & Kaplan, LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

Sercombe, J., concurring.

## ORTEGA, P. J.

At issue in this case is whether the City of Portland Bureau of Fire and Police Disability and Retirement Fund (the fund) correctly denied claimant's application for disability benefits. The fund appeals the reviewing court's general judgment granting a writ of review setting aside the fund's denial of benefits to claimant. The fund contends that the time limitation in the rule on which it relied to deny claimant disability benefits begins to run when a member of the fund first receives treatment for a condition that the member subjectively believes to be a worsening of a prior service-connected injury. We disagree with the fund's interpretation of the time-limitation rule and, accordingly, conclude that the fund has not established that the reviewing court erred in setting aside the fund's denial of benefits. We affirm.

Claimant works as a firefighter for the City of Portland Fire and Rescue, which entitles him to disability benefits under the Fire and Police Disability, Retirement and Death Benefit Plan (the plan), adopted as chapter 5 of the City of Portland's charter.[1] The plan provides that a board of trustees supervises and controls the fund and that the board establishes the plan's administrative rules; claim approvals and denials are delegated to a fund administrator. Portland City Charter (charter) § 5-202.

In 1985, claimant fell about five feet through the roof of a burning building while working and landed straddling a beam between his legs. He received medical care and was diagnosed with a possible hairline fracture in his pelvis. For that injury, the fund approved claimant's application for disability benefits. Over time claimant continued

---

[1] The plan provides workers' compensation benefits for the city's firefighters and police officers, who are considered "Members" of the plan. Members of the plan are exempted from ORS chapter 656, which governs workers' compensation generally. *See* ORS 656.027(6) (providing that workers are not subject to ORS chapter 656 if they are "[f]irefighter and police employees of any city having a population of more than 200,000 that provides a disability and retirement system by ordinance or charter"). We have stated that the exemption must be for "equivalent compensation." *See Harrington v. Board of Trustees*, 100 Or App 733, 738 n 3, 788 P2d 1019, *rev den*, 310 Or 133 (1990). ("ORS 656.027(6) defines a class that is exempt from the Workers' Compensation Law because it is entitled to equivalent compensation. We cannot say that the legislature made an irrational choice in defining such an exemption.").

to experience pain in his pelvic area, and, in 2006 and 2008, he sought treatment, but imaging tests did not indicate an abnormality.

On January 19, 2009, claimant's pain and symptoms persisted, and he again sought treatment. On that occasion, a urologist, Dr. Ackerman, diagnosed his symptoms, which included, among other things, a lump in the middle of his penile shaft that was consistent with Peyronie's disease. Ackerman discussed treatment options with claimant, including surgery. Claimant told Ackerman that he believed that his condition was related to the 1985 injury, but Ackerman's report did not include any mention that claimant's Peyronie's disease was related to work or to his prior injury. Ackerman prescribed medication to treat claimant's symptoms and saw claimant again on June 22, 2009; they again discussed surgery as a way to treat claimant's condition. Once again, Ackerman did not, in his report, relate claimant's condition to any prior injury or to claimant's job.

Claimant decided to proceed with the surgery and met with Dr. Yoshinaga for a preoperative appointment on August 25, 2009. At that time, Yoshinaga told claimant that his Peyronie's disease was related to his work injury. He was the first treating physician to do so. Yoshinaga completed physician's disability reports, which noted that claimant was not authorized to work for the two weeks following his scheduled September 14, 2009, surgery. Yoshinaga's "Attending Physician Report" noted, under the heading, "Subjective Findings," that Ackerman had stated (without indicating how the statement was communicated to Yoshinaga) that claimant's Peyronie's disease "is caused by previous injury to the penis and scar tissue."

On the day of claimant's preoperative appointment, claimant completed a "disability in line of duty" report for a disability claim, noting the date of his 1985 fall as the date that his injury occurred and that he would need time off from work. The surgery was rescheduled and performed on October 21, 2009. As a condition of making a compensability decision on his claim, the fund required claimant to undergo two independent medical examinations on November 5, 2009. In its letter to the medical examiners, Drs. Kaempf

and Rischitelli, the fund asked them to determine, "[g]iven the work history and medical records, in your opinion, is there medical evidence, supported by objective findings[,] that the [1985] on-the-job injury was a significant factor in the cause of [claimant's] development of Peyronie's Disease?" (Underscoring omitted.) Kaempf concluded that claimant's 1985 injury was a significant factor, and Rischitelli concluded that it was not.

The fund denied the claim, for the reason that the "claim was not filed within 30 days of [claimant's] alleged injury or illness as required by Section 5.7.03 of the * * * Administrative Rules." That rule provides, in part:

"(A)   No disability benefits shall be paid to a Member unless the Member files with the Director a complete and timely application requesting such benefits.

"* * * * *

"(D)   Applications for disability benefits must be submitted to the Director no later than 30 days after the Member is injured or experiences an illness, unless the Member establishes good cause for failing to do so. Failure to file an application within the time specified bars a Claim for disability benefits."

Fire and Police Disability and Retirement Fund Rule (FPDR) 5.7.03.

Claimant requested a hearing to contest the denial with the Office of Administrative Hearings (OAH). The fund's attorney met with Ackerman in anticipation of the hearing. A letter memorializing their conversation noted that Ackerman had confirmed to the fund's attorney that claimant

"'definitely' told you during your examination on January 19, 2009 that his symptoms and related objective findings, which you diagnosed as Peyronie's disease, were caused by his employment as a firefighter for the City of Portland and that he recounted to you the work injuries in that job which he believed caused the Peyronie's disease. You included this history of work injuries in your January 19, 2009 chart note. *You believe that the January 19, 2009 chart note confirms [claimant] telling you that he believed his need for medical treatment was related to the work injuries described*

*in your chart note. You did not tell [claimant] that his condition or need for treatment were not work related."*

(Emphasis added.)

A hearing was held, and the OAH administrative law judge (ALJ) issued an order reversing the fund's denial of the disability claim, finding that FPDR 5.7.03(D) did not apply to claimant's request for disability benefits. The fund appealed the ALJ's order to an OAH appellate review board, a panel of three ALJs. The fund asserted before the panel that the time-limitation rule applied and that the relevant date to begin the time limit for claimant's recurrence of his service-connected injury "should be the first date of medical treatment or disability related to the worsened condition"; the relevant date, the fund asserted, was no later than claimant's January 19, 2009, appointment with Ackerman in which claimant was diagnosed with Peyronie's disease and told Ackerman that he believed his condition was related to the prior work injury. The panel agreed with the fund that FPDR 5.7.03(D) applies to a recurrence claim and that the claim was untimely submitted. To interpret the time-limitation rule, it looked to the definitions for the relevant administrative section in FPDR 5.7.01, namely "Recurrence" and "Aggravation."[2] "Recurrence" is defined as an

> "Aggravation of a service-connected injury/illness or occupational disability that requires Claim re-opening for additional disability benefits and/or medical benefits."

FPDR 5.7.01. In turn, the term "Aggravation"

> "means a Worsening of an approved service-connected injury/illness or occupational disability that occurs after the Member's condition has been deemed medically stationary."

*Id.* The panel reasoned that claimant

> "*subjectively believed* that his condition was related to his 1985 injury. He went to Dr. Ackerman because he believed his condition was getting worse. Thus, as of January 19,

___

[2] Unless otherwise noted, we cite and quote the version of the FPDR that was in effect in 2009 and relied upon by the OAH and the parties.

2009, [claimant] believed that he had a worsening of his 1985 injury that required treatment."

(Emphasis added.) Notably, the panel did not discuss the FPDR 5.7.01 definition of "Worsening," discussed below, in its analysis. The panel concluded that the time claimant first became aware that his condition was related to his prior injury was sufficient to make claimant eligible for medical or disability benefits for his worsening, and, thus, his January 2009 appointment and diagnosis was a compensable medical benefit that began the 30-day claim-filing deadline.

Claimant then filed a petition for a writ of review in Multnomah County Circuit Court, challenging the panel's final order that denied his disability claim. The reviewing court reversed the OAH final order and set aside the fund's denial of the disability claim. Although the reviewing court agreed with the panel's conclusion that claimant was required to submit a claim or application for a recurrence, it disagreed with the panel's determination that claimant's application was untimely. In its written opinion, the reviewing court concluded that the 30-day limitation rule applies to recurrence claims only if the "Recurrence" is a disabling injury, i.e., one that requires time loss, and, thus, the January 2009 diagnosis did not start the time-limitation rule, because at that time, claimant was not eligible for disability benefits because he did not have a disabling injury.[3]

_____

[3] Our concern with the conclusion that the need for time-loss benefits begins the 30-day claim-filing deadline is that the conclusion creates an implication that medical benefits are not available to members unless the fund first approves time-loss benefits for a work injury, i.e., work-related injuries that do not require time loss are not compensable by the fund. As the concurring opinion acknowledges, medical expenses are reimbursed after a claim is approved under FPDR 5.7.03. 266 Or App at 272 (Sercombe, J., concurring). Because the concurring opinion concludes that claim approval under FPDR 5.7.03 concerns only injuries that require time-loss benefits, i.e., disabling injuries, 266 Or App at 270 (Sercombe, J., concurring), it follows that medical expense reimbursement would require that a member's injuries are disabling. If, on the other hand, the term "disability benefits" in FPDR 5.7.03 is understood to mean time-loss benefits and medical-expense reimbursement, as the fund contends, eligibility for medical-expense reimbursement does not require that a service-connected injury is disabling.

A construction of the charter and the rules that has the implication that nondisabling injuries are not compensable by the fund is untenable. Neither party contemplates that the plan should be construed that way. The fund asserts that recurrence claims can be for medical treatment only, noting that the definition of "Recurrence" is an injury that "requires claim re-opening for additional disability

The parties' arguments on appeal, consisting of interpretations of the text and context of several charter and rule provisions, are directed at the reviewing court's conclusion that FPDR 5.7.03(D)'s time limitation begins when the claimant is eligible for time loss as a result of his service-connected injury as a basis for its grant of the writ of review that reversed the panel's order. We affirm the reviewing court's grant of claimant's writ of review to set aside the denial of his claim but do so, as we discuss below, for different reasons. The concurring opinion, however, states that we are "abandon[ing our] duty to review the legal correctness of the reviewing court's order and judgment" and tasks us with determining the "correct meaning of [FPDR 5.7.03(D)]" so that we may "remand the case to the reviewing court to apply or require the fund to apply that interpretation." 266 Or App at 265, 265-66 (Sercombe, J., concurring). A *discussion* of the reviewing court's reasoning that provides a definitive interpretation of FPDR 5.7.03(D) is, however, unnecessary. That is so because we decide whether there was a sufficient basis under the charter and the rules for the fund to deny claimant benefits based on the fund's fundamental premise for its argument that claimant's January 2009 medical visit, when claimant had only his own suspicion that his condition was related to his original injury, triggered the 30-day claim-filing deadline under FPDR 5.7.03(D).[4] We

---

benefits and/or medical benefits." FPDR 5.7.01 (emphasis added). Claimant, on appeal, refers to the *former* version of charter section 5-306(g)(2), which does not limit reasonable medical and hospital expense reimbursement to "accepted" claims. Thus, claimant contemplates that medical-expense reimbursement is separately provided for in FPDR 5.9.01 *et seq.* without any need for a claimant to obtain fund approval for time loss.

Moreover, the implication that benefits for nondisabling injuries are not compensable by the fund runs contrary to the need to make the fund benefits equivalent to workers' compensation benefits, 266 Or App at 250 n 1. Oregon's workers' compensation laws provide for compensation for nondisabling injuries that are aggravations of injuries. *See* ORS 656.005(7)(d) ("A 'nondisabling compensable injury' is any injury which requires medical services only."); ORS 656.273 (providing for worsened conditions).

[4] Claimant filed his claim application forms on August 25, 2009, the day he was informed that his condition was related to his 1985 work injury, required surgery, and that he would need two weeks of time loss to recover from the surgery. The fund does not contend that, if January 19, 2009 was the incorrect date to trigger the 30-day deadline, then there is some other reason that the August 25, 2009, date was untimely. Consequently, we need not address the reviewing court's rationale for determining that the August 2009 disability claim filing was timely.

conclude, as we explain below, that it does not, and, thus, our task ends there.

The fund challenges the reviewing court's conclusions and urges us to adopt the panel's analysis of FPDR 5.7.03(D). We construe municipal administrative rules in the same manner as we construe Oregon statutes and administrative rules: We discern the intent of the body that promulgated the law by examining the text, context, and helpful legislative history of the provision in dispute and, if necessary, turn to maxims of construction. *See Lincoln Loan Co. v. City of Portland*, 317 Or 192, 199, 855 P2d 151 (1993) ("The same rules that govern the construction of statutes apply to the construction of municipal ordinances."); *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (setting out the methodology for statutory interpretation); *see also State v. Hogevoll*, 348 Or 104, 109-10, 228 P3d 569 (2010) ("In construing an administrative rule, we apply the same analytical framework that applies to the construction of statutes.").

The rules do not support the fund's assertion (as the panel ruled) that the time-bar rule begins on the first occasion a member is eligible for medical treatment of a recurrence and that eligibility is established based on a claimant's subjective belief that his or her condition is related to an approved service-connected injury. According to the fund, the term "is injured" in the rule includes a recurrence, and claimant's eligibility for benefits to treat the recurrence triggers FPDR 5.7.03(D). A "Recurrence," as noted earlier, is

"[a]n Aggravation of a service-connected injury/illness or occupational disability that requires Claim re-opening for additional disability benefits and/or medical benefits."

FPDR 5.7.01. An "Aggravation," also noted earlier, means

"a Worsening of an approved service-connected injury/ illness or occupational disability that occurs after the Member's condition has been deemed medically stationary."

*Id.* And finally, a "Worsening" means

"objective findings indicating a worsening of the approved service-connected injury/illness or occupational disease based on expert medical opinion or an expert medical opinion explaining why the Member's symptoms indicate a

worsening of the approved service-connected injury/illness or occupational disability."

*Id.* Thus, a "Recurrence" requires a worsening of the original injury after it has become medically stationary, and, in particular, the "Recurrence" requires either *objective findings* that indicate that a prior service-connected injury has worsened based on medical evidence or an *expert medical opinion explaining* why a claimant's symptoms indicate that a prior service-connected injury has worsened.[5] Put in the context of FPDR 5.7.03(D), without those objective findings, and, therefore, without any "Recurrence," a timeliness requirement for filing a *recurrence* claim is not at issue *if there is not a recurrence of an injury or illness for which a member could file benefits.*

We conclude that the fund's denial of claimant's disability claim was erroneous because in January 2009 there was no recurrence for which a claim could be filed. The fund's contention that it "is reasonable to trigger the 30-day deadline in FPDR 5.7.03(D) from the time [claimant] admits he was seeking medical treatment for what *he considered* to be symptoms related to his service-connected injury" effectively creates a subjective standard that is different from the objective findings or expert medical explanation required by the definition of "Worsening." (Emphasis added.) The fund's reliance on claimant's subjective, nonexpert belief that his condition was related to his prior injury when he sought medical treatment in January 2009—namely, claimant's admission that he believed then that his condition arose from the prior injury and Ackerman's later affirmation that he did not tell claimant otherwise at that time—to establish his eligibility for benefits ignores the objective requirements for establishing a "Worsening." Put differently, the fund incorrectly treated claimant's subjective belief about

---

[5] We recognize the circularity of the definition. The definition of "Worsening" in Rule 5.7.01 has been amended, effective March 25, 2014, to mean

"objective findings indicating a *deterioration* of the approved service-connected injury/illness or occupational disability based on expert medical opinion or an expert medical opinion explaining why the Member's symptoms indicate a worsening of the approved service-connected injury/illness or occupational disability."

(Emphasis added.)

his condition when he received medical treatment from Ackerman in January 2009 as sufficient to begin the 30-day time limitation of FPDR 5.7.03(D). Because that basis was insufficient to deny claimant disability benefits, and because that argument is the fundamental basis for the fund's contention that we should reverse the reviewing court's ruling on the writ of review, the fund has not established grounds for reversal.

Affirmed.

**SERCOMBE, J.,** concurring.

Chapter 5 of the Portland City Charter (PCC) creates the Fire and Police Disability and Retirement Fund and establishes policies for the administration of the fund and payment of retirement and disability benefits to members of the fund—city police officers and firefighters. A board of trustees administers the fund and is authorized to adopt rules to implement the charter provisions. PCC § 5-202(a). One of those rules, Fire and Police Disability and Retirement Fund Rule (FPDR) 5.7.03(D), requires that "[a]pplications for disability benefits must be submitted to the Director no later than 30 days after the Member is injured or experiences an illness, unless the Member establishes good cause for failing to do so."

The issue that we must resolve in this case is when an application for supplemental disability benefits is due under that rule in circumstances where a disability benefits claim is reopened after closure—long after the time of the initial work injury or illness and the qualification of that injury or illness as service-connected—because the work injury has worsened and disabled the member again (a recurrence of the service-connected injury or illness). In the proceedings below, a writ-of-review court concluded that claimant's application for disability benefits was timely because it was filed within 30 days from the time that a worsened injury caused a need for disability benefits.

On review for whether the reviewing court's construction of the rule is legally correct, I conclude that it is. Specifically, I agree with the reviewing court that the rule applies to the circumstances presented here and that, under

the text and context of the rule, the time to make a post-closure claim for disability benefits is measured from the time the recurrence of the injury became disabling.

An application for disability benefits under FPDR 5.7.03(D), either because of an original injury or a recurrence of that injury, is measured from a single point in time—the time that "the Member is injured or experiences an illness." That application, both for an original injury and a recurrence of that injury, seeks two things: a qualification of the claim as work-related or service-connected and a determination that the claimant is disabled and entitled to time-loss benefits. It follows that the time to apply for disability benefits for a recurring injury is measured from a specific benchmark—from the time that the injury recurred and caused a need for time-loss compensation and a determination of service-connectedness. That specific benchmark is when the claimant is disabled by a recurrence of a service-connected injury or illness. Thus, I concur that the reviewing court's judgment should be affirmed, but not based upon the reasoning advanced by the majority.

FPDR 5.7.03 describes the application process for "disability benefits" and provides:

"(A)   No disability benefits shall be paid to a Member unless the Member files with the Director a complete and timely application requesting such benefits.

"* * * * *

"(D)   Applications for disability benefits must be submitted to the Director no later than 30 days after the Member is injured or experiences an illness, unless the Member establishes good cause for failing to do so. Failure to file an application within the time specified bars a Claim for disability benefits.

"(E)   By making application for disability benefits, each applicant thereby authorizes the Director to request and obtain [documents and information] regarding the applicant's health, income and employment which in any way relates to the applicant's Claim of disability and/or capacity to engage in Substantial Gainful Activity. * * *

"(F)   All applications for service-connected disability benefits shall contain a report of a superior officer, the

signature of the Chief of the Bureau affected and a report of the Member's Attending Physician."

FPDR 5.7.03 applies both to an initial claim for disability benefits related to a service-connected injury or illness and a claim for benefits because of a recurrence of that injury or illness. A "[r]ecurrence" is defined by FPDR 5.7.01 to be "[a]n Aggravation of a service-connected injury/illness * * * that requires Claim re-opening for additional disability benefits and/or medical benefits." "Aggravation," in turn, is defined by the same rule to be "a Worsening of an approved service-connected injury/illness * * * that occurs after the Member's condition has been deemed medically stationary." After either type of claim is filed, it is approved or denied by the director of the fund under FPDR 5.7.04(B):

> "The Director shall provide written notification of Claim approval or Claim denial to the Member or the Member's representative, and the Member's attending physician within sixty (60) days of the Director's receipt of a written application for benefits. This applies to the initial claim for benefits and subsequent Claims for Recurrence or Aggravation benefits."

As recounted by the majority, this case concerns whether the fund properly denied claimant's claim for recurrence benefits, and, specifically, whether claimant's application for those benefits was timely under FPDR 5.7.03(D). Each of the decision-makers in the proceedings below, as well as the majority, answered the filing deadline question differently. The fund denied the claim because the application was filed more than 30 days after the injury had actually worsened. On review, an administrative law judge (ALJ) concluded that FPDR 5.7.03(D) applied only to initial claims for disability benefits and did not limit the time to file for a reopening of the claim because the work injury or illness had recurred.

On further review, an independent panel of three ALJs determined that FPDR 5.7.03(D) governed claimant's post-closure application for disability benefits from the worsening of an approved service-connected injury, and a "recurrence exists once a condition has worsened to such an extent that the Member is eligible for additional disability *or* medical benefits." (Emphasis in original.) The panel further

determined that the rule requires that the application be filed no later than 30 days after the claimant "first becomes aware that the condition might be related to the approved claim and had worsened to the extent that it could entitle the [claimant] to additional medical or disability benefits." The panel reasoned that when an injury has worsened may be difficult to detect, so that the triggering event for an application for recurrence disability benefits must include some other marker in addition to a worsening-in-fact:

> "[Claimant's] assertion that the deadline should not be triggered until a Member seeks benefits is not supported by the Fund's rules. FPDR Admin. Rule 5.7.03(D) explicitly states that the applicable deadline begins on the date of the injury or illness. The date of injury or illness does not necessarily coincide with the date of a medical procedure for the injury or illness or time lost from work. Nor do the rules suggest that the timeliness of a claim can be measured from the time that a Member elects to receive benefits. The fact that a member may choose to delay seeking disability or medical benefits does not thereby extend the period for filing a timely claim.

> "* * * * *

> "We agree with the Fund that the triggering event in a recurrence claim is often difficult to pinpoint. In a given case, the nature of the worsening or disability may be such that the triggering event is obvious. For example, a sudden exacerbation of a previously approved back condition that causes a Member to be unable to work could constitute a recurrence even if the Member did not seek medical treatment. However, in cases where the connection between the current condition and the one previously approved is not so clear, it is reasonable to treat the triggering event as the time when a Member first becomes aware that the condition might be related to the approved claim and had worsened to the extent that it could entitle the Member to additional medical or disability benefits."

Claimant sought a writ of review, and the court considered whether the panel "[i]mproperly construed the applicable law" under ORS 34.040(1)(d) (stating that standard of review) and concluded that it had. The reviewing court agreed with the panel that FPDR 5.7.03(D) applies to qualification of post-closure claims for disability benefits. However,

the court disagreed with the panel's legal conclusion that FPDR 5.7.03(D) requires a claim for additional benefits to be filed within 30 days of the time that the claimant becomes aware of the service-connectedness of the worsened injury. It explained:

> "'Recurrence' is defined, in relevant part, as a Worsening of a service connected injury that: (1) occurs after the Member has been deemed medically stationary; and (2) requires Claim re-opening for additional disability benefits and/or medical benefits. So a 'Recurrence' in the context of disability benefits 'requires' reopening of the disability claim. Any 'Recurrence' of an injury must be 'disabling' to trigger the 30 day clock in Rule 5.[7].03(D). To find otherwise would be contrary to Rule 5.7.02, which provides that 'Disability benefits will be paid to a Member only during such time as a Member is unable to perform his or her required duties in the Bureau of Fire and Rescue . . .' Thus, the 30 day clock for disability claims under Rule 5.[7].03(D) can only commence when a member becomes eligible for disability benefits based on a Recurrence (which 'requires' reopening of the disability claim), or at a time that the Recurrence causes the Member to be unable to perform his work duties."

In other words, the reviewing court found that an application for recurrence-related disability benefits necessarily cannot be filed until a claimant is disabled, that is, until a claimant is unable to perform his or her work duties. The occurrence of that disability triggers the time to apply for benefits. As applied to claimant, the court concluded that his application for disability benefits was timely because it was filed before 30 days after his disability—his inability to work because of surgery and recovery from surgery.

On appeal, the fund argues that the reviewing court erred in its construction of FPDR 5.7.03(D). It does not argue that the panel was correct when it held that the FPDR 5.7.03 deadline is triggered by a claimant's subjective belief that the worsened injury was service-connected. The fund does not dispute that the time to apply for disability benefits begins to run when the work injury worsens and the claimant becomes entitled to benefits. The fund's caveat, however, is that the time to apply for disability benefits begins to run from the time a claimant becomes entitled to either disability or medical services benefits, whichever is earlier; in other

words, that the claimant "was injured, in essence, when his need for any benefits from [the fund] recurred." According to the fund, the charter provisions and rules treat medical services reimbursement as a type of disability benefit, so that an "[a]pplication for disability benefits" under FPDR 5.7.03(D) can refer to an application for time-loss benefits or medical services cost reimbursement. From that, the fund concludes that the time to file an application for recurrence disability benefits begins to run when a claimant qualifies for *any* disability *or* medical services benefit. In this case, the fund argues that claimant qualified for medical services disability benefits when he obtained medical treatment for the worsened injury on January 19, 2009, the 30 days began to run at that point, and the deadline expired before his August 25, 2009, claim application. (And, according to the fund, claimant should have applied for *all* benefits in January 2009—even benefits related to a disability that had not yet occurred.)

Claimant, for his part, argues that a recurrence claim for disability benefits arises when there is a need for disability benefits, that is, when a claimant is unable to work. Claimant contends that an application for disability benefits is not a claim for reimbursement of the cost of medical services, and that medical services claims are governed by different rules in a chapter entitled "Medical Benefits Plan" (FPDR 5.9.01 *et seq.*), which have their own claims process with a different deadline than the one for disability benefits under FPDR 5.7.03.

The majority does not address that dispute. It does not decide whether the application deadline is triggered by an actual worsening or aggravation of a service-connected injury or illness plus: (1) a need for medical services; (2) a need for time-loss compensation (disability status); (3) either a need for medical services or time-loss compensation; or (4) nothing else. Instead, the majority concludes that it does not need to assess whether the reviewing court's construction of the rule was correct. It is sufficient, according to the majority, to conclude that the panel's construction of the rule was incorrect—that the subjective knowledge of the claimant of the service-connection of the aggravated or worsened injury/illness is immaterial to the application deadline. That

determination alone, the majority reasons, is sufficient to affirm the reviewing court's judgment setting aside the fund's denial of claimant's application.

The majority, however, hints at how it would set the required application deadline for a recurrence under FPDR 5.7.03(D). Based on the definition of "[w]orsening" in FPDR 5.7.01, the majority suggests that the application deadline is tied to the time that a physician certifies that the aggravated injury or illness is service-connected. I disagree with that construction of FPDR 5.7.03(D), which was not advanced by the fund (in its denial letter), the ALJ, the independent panel, the reviewing court, or either party on appeal.

As noted, FPDR 5.7.01 defines a "[r]ecurrence" to mean "[a]n Aggravation of a service-connected injury/illness * * * that requires Claim re-opening for additional disability benefits and/or medical benefits." "Aggravation," in turn, is defined under the same rule, to be "a Worsening of an approved service-connected injury/illness * * * that occurs after the Member's condition has been deemed medically stationary." Finally, FPDR 5.7.01 defines "Worsening" to mean an expert medical opinion that contains "objective findings" or an explanation "indicating a worsening of the approved service-connected injury/illness." The majority reasons that, for recurrence claims, the time that "the Member is injured or experiences an illness" under FPDR 5.7.03(D) is the time that a recurrence occurs, and that a recurrence does not occur until a worsening of an accepted injury or illness is documented by a physician: "Put in the context of FPDR 5.7.03(D), without those objective findings, and, therefore, without any 'Recurrence,' a timeliness requirement for filing a *recurrence* claim is not at issue *if there is not a recurrence of an injury or illness for which a member could file benefits.*" 266 Or App at 257 (emphasis in original). The majority implies, then, that a recurrence claim can be filed no later than 30 days after a physician issues a written opinion or explanation that a service-connected injury or illness has worsened, even if that physician statement occurs months or years after the injury or illness becomes aggravated and the claimant needs disability benefits.

I disagree with both the majority's explicit and implicit conclusions. In my view, the majority abandons its duty to review the legal correctness of the reviewing court's order and judgment. Under ORS 34.100, "[f]rom the judgment of the circuit court on [writ of] review, an appeal may be taken in like manner and with like effect as from a judgment of a circuit court in an action." This means that we "may affirm, reverse or modify the judgment or part thereof appealed from as to any or all of the parties joining in the appeal." ORS 19.420(1). In *Davis v. Jefferson County*, 239 Or App 564, 571, 245 P3d 665 (2010), we stated that the standard of review in writ of review cases is "for errors of law; that is, we ask whether the trial court correctly [reviewed the lower tribunal's decision for errors of law]." *See also Friends of Polk County v. Oliver*, 245 Or App 680, 688, 264 P3d 165 (2011), *rev den*, 351 Or 586 (2012) (same). In this case, we are obliged to decide whether the reviewing court was correct in concluding that the disability benefits application was timely filed.

The majority ducks that question. It reasons that its rejection of a "fundamental premise" of the independent panel decision makes a "discussion of the reviewing court's reasoning * * * unnecessary." 266 Or App at 255 (emphasis omitted). With respect, that reasoning is incorrect. The reviewing court's judgment sets aside the fund's "November 30, 2009 denial of benefits [based] on the purported untimely submission of Claimant's application for benefits." The fund's denial was because the "claim was not filed within 30 days of [the] alleged injury or illness." The reviewing court's order that underlies its judgment expressly determines that claimant's "application for benefits prior to his October 21, 2009 surgery was timely." The fund challenges those determinations of the reviewing court in its assignment of error: "The circuit court committed legal error in interpreting FPDR Administrative Rule 5.7.03(D) for a Recurrence Claim as allowing a claim to be filed within 30 days of disability as a result of a scheduled surgery." In order to address that assignment of error and review the issued judgment, we are obliged to determine if the court correctly interpreted the rule. If it did not, then we should determine the correct meaning of the rule and remand the case to the reviewing court to apply or

require the fund to apply that interpretation. The conclusion that the independent panel got it wrong does not answer the question whether the reviewing court got it right.

The majority is also wrong to imply that the time to apply for disability benefits related to a recurrence is pegged to the time that a physician issues written documentation of the occurrence of an aggravation of a service-connected injury or illness. First, that interpretation of FPDR 5.7.03(D) would permit a claimant to control the timing of the application deadline by delaying the obtaining of any physician statement until the claimant is ready to apply. In practical terms, the majority's interpretation reads FPDR 5.7.03(D) to state no deadline at all to apply for a recurrence claim—the deadline is whenever the claimant desires to proceed. We should not construe the rule to avoid its stated intent.

Second, the majority's interpretation of the rule allows a claimant multiple opportunities to apply for benefits when a medically stationary and service-connected injury or illness becomes aggravated over a period of time. A recurrence would occur each time that a physician documents a worsening of a service-connected injury or illness, even if a claimant suffers a need for time-loss compensation or medical services reimbursement from the initial aggravation. That indeterminate application period is inconsistent with the rule's elucidation of a single point of time within which to apply, "30 days after the Member is injured or experiences an illness." There would be no fixed deadline if the time to apply for disability benefits for an injury that is worsening is measured from any time that (1) the condition changes, (2) the member is aware that the condition has changed, or (3) a physician documents that the work injury has changed. Instead, the deadline is better pegged, as both parties agree, from the time that the need for disability benefits arises.[1]

---

[1] Admittedly, defining a medical condition ("[w]orsening") to mean a physician action (issuance of findings or explanation by a physician) under FPDR 5.7.01 is peculiar. FPDR 5.7.03(F) generally requires an application for disability benefits to contain a "report of the Member's Attending Physician." That report presumably would certify that the member has become disabled due to an injury or illness. (Under the same rule, the application separately establishes that the injury or illness is service-connected through "a report of a superior officer [and] the signature of the Chief of the Bureau affected.") The definition of "[w]orsening," in my view, merely establishes that the physician report that is

That better interpretation of FPDR 5.7.03(D)—one that creates a fixed deadline for a recurrence claim and allows early investigation of that claim by the fund, and one that can be consistently applied to original and recurring injuries and illnesses—is this: An application for disability benefits for time-loss compensation is not due under the rule until the claimant suffers an original or aggravated service-connected injury or illness and the claimant misses work (*i.e.*, is disabled) because of that injury or illness. That interpretation of the rule was adopted by the reviewing court, and it is suggested by the context of the charter provisions and other rules that regulate the obtaining of disability benefits from the fund.[2]

Again, the issue before us is the meaning of "[a]pplication for disability benefits" and "the Member is injured or experiences an illness" under FPDR 5.7.03(D). The method we use to discern that meaning is familiar. In construing an administrative rule, we apply the same analytical framework that applies to the construction of statutes. *State v. Hogevoll*, 348 Or 104, 109-10, 228 P3d 569 (2010). Thus, in determining the proper construction of FPDR 5.7.03(D), we look to its text, the context of the rule and related rules, the context of the charter provisions that the rule implements, any relevant legislative history of the rule, and, if necessary, maxims of construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *see also State v. Ofodrinwa*, 353 Or 507, 512, 300 P3d 154 (2013) ("The context for interpreting a statute's text includes *** the statutory framework within which the law was enacted." (Internal quotation marks omitted.)); *Force v. Dept. of Rev.*, 350 Or 179, 188, 252 P3d 306 (2011) ("'[C]ontext' includes, among other things,

_____

part of an application for recurrence disability benefits certify that the original injury or illness has worsened.

[2] The parties do not dispute that claimant was required to file an application for disability benefits under FPDR 5.7.03 in order to obtain those benefits. I agree with that conclusion. FPDR 5.7.03(A) provides that "[n]o disability benefits shall be paid to a Member unless the Member files with the Director a complete and timely application requesting such benefits." After providing for the 30-day application deadline, FPDR 5.7.03(D) goes on to say that "[f]ailure to file an application within the time specified bars a Claim for disability benefits." Moreover, as noted, FPDR 5.7.04(B) covers disposition of claims and provides that the director must provide notification of claim approval or denial for "subsequent Claims for Recurrence or Aggravation benefits."

other parts of the statute at issue."); *State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012) (a statute's context includes "related statutes").

FPDR 5.7.01 defines some of the terms used in FPDR 5.7.03(D). "Application[] for disability benefits" is synonymous with the term "claim":

> "The term 'Claim' means a written request to [the fund] for a retirement, disability or death benefit and may be filed by an active member, his/her representative or legal beneficiary, or surviving spouse or other legal representative of a deceased member. This term may be used synonymously with the term 'application.'"

Although "injury" is not defined, "Original Injury" under FPDR 5.7.01 means

> "the period from the first occasion of medical treatment or disability resulting from a service-connected injury/illness or occupational disability through the date the member first reaches a medically stationary status."

Thus, the time of an "injury" may mean the time of "the first occasion of medical treatment or disability" related to an actual service-connected injury or illness.

The context of FPDR 5.7.03(D) includes related charter and rule provisions. As noted, chapter 5 of the PCC establishes the fund, delegates authority to the fund's officers and trustees, sets out the process for disability claims processing, and defines the amount and duration of the provided disability, death, and retirement benefits. The board of trustees has adopted rules to implement those charter provisions.[3]

That context offers two insights into the meaning of "application for disability benefits" or "claim" that settle the question of whether the time of an injury or illness is

---

[3] The rules contain chapters on general administration (FPDR 5.3.01 *et seq.*), the retirement benefits and appeals process (FPDR 5.4.01 *et seq.*), death benefits (FPDR 5.5.01 *et seq.*), the appeals process for disability claims (FPDR 5.6.01 *et seq.*), the process for obtaining and paying service-connected or occupational disability benefits (FPDR 5.7.01 *et seq.*), the process for obtaining and paying nonservice-connected disability benefits (FPDR 5.8.01 *et seq.*), the process for reimbursement of medical services expenses by a recipient of disability benefits (FPDR 5.9.01 *et seq.*), and vocational rehabilitation programs (FPDR 5.10.01 *et seq.*).

measured from the first occasion of medical treatment or the time the member becomes disabled. First, under the charter and rules, the application or claim functions both to establish the injury or illness as service-connected and to qualify the claimant as disabled. Second, an application under FPDR 5.7.03(D) is for "disability benefits," specifically, time-loss compensation. That context suggests that an application for disability benefits is premature until there is a need for time-loss compensation and the applicant can be qualified as disabled.

Again, the purpose of an application for disability benefits under the rule is twofold. First, the application seeks a determination of a claimant's eligibility for disability benefits. Under PCC section 5-306(a), "[a]n Active Member shall be eligible for the service-connected disability benefit when unable to perform the Member's required duties *because of an injury or illness arising out of and in the course of* the Member's employment in the Bureau of Police or Fire." (Emphasis added.) FPDR 5.7.04(A)(1), relating to "claim approval or denial," provides that "Disability Claim applications" for "Service-Connected Disability Claims" require the director to "determine the existence of a disability and whether the preponderance of the evidence indicates it arises out of and in the course of the Member's employment." The director must provide "written notification of Claim approval or Claim denial * * * within sixty (60) days of the Director's receipt of a written application for benefits. This applies to the initial claim for benefits and subsequent Claims for Recurrence or Aggravation benefits." FPDR 5.7.04(B). A claim approval must state "that the injury/illness occurring on the particular date has been approved." *Id.* Therefore, an application for disability benefits for an aggravated or worsened work injury under FPDR 5.7.03 seeks a determination that a disability exists (that the claimant is unable to work) *and* that the disability results from a service-connected aggravated or worsened work injury (acceptance of the recurrence).

Second, an application under FPDR 5.7.03 seeks an award of "disability benefits"—that is, time-loss compensation. The fund contends that "disability benefits" under the rule includes an approval of medical services reimbursement

and that the time to apply for disability benefits is measured from the earliest time that medical services are obtained or the member becomes disabled. The premise underlying the fund's contention is wrong. Both the charter and the rules use the term "disability benefits" to mean only time-loss compensation. It is reasonable to conclude that the term "disability benefits" means the same thing throughout the charter and the fund's rules implementing the provisions of the charter. *See Tharp v. PSRB*, 338 Or 413, 422, 110 P3d 103 (2005) ("When the legislature uses the identical phrase in related statutory provisions that were enacted as part of the same law, we interpret the phrase to have the same meaning in both sections.").

Under the charter and the rules:

1. *Eligibility for a "service-connected disability benefit" is tied to the existence of a disability, an inability to work, and not to the incurring of medical expenses.*

As just noted, PCC section 5-306(a) links eligibility for a "service-connected disability benefit" to a disability that arises out of and in the course of a member's employment. Under PCC section 5-306(d), a disability benefit is paid "until the earliest date on which the Member is both medically stationary and capable of Substantial Gainful Activity." FPDR 5.7.02(A) further explains that "[d]isability benefits will be paid to a Member only during such time as the Member is unable to perform his or her required duties in the Bureau of Fire and Rescue or Bureau of Police."[4] "After Claim approval, a member may be paid a disability benefit by [the fund] for each authorized absence from work" for medical appointments. FPDR 5.7.06(B).

2. *"Disability benefits" are defined to be a percentage of a claimant's salary and are not defined to include expenses for medical or hospital services or rehabilitation costs.*

PCC section 5-306(d) limits the "Amount of Benefits" to be paid to a member eligible for the disability benefit

---

[4] FPDR 5.7.02(A) is the rule that the reviewing court found to be contextually relevant to the meaning of FPDR 5.7.03(D). The majority argues that the rule relates only to the duration of time-loss benefits. The rule, however, plainly requires that disability benefits are paid only during the time that a member is disabled and cannot be paid before that time.

under section 5-306(a) to a specified percentage of the member's salary ("rate of Base Pay in effect at disability"). Under FPDR 5.7.05, "[d]uring the period the Member continues to be eligible under this section, benefits shall be paid" at a certain percentage of "the Member's rate of Base Pay in effect at disability." If a member is demoted during the time that the member is receiving disability benefits, the "disability benefit will be based on the base pay of the position held at the time the Member first became disabled on the Claim." FPDR 5.7.02(B)(1).

3. *"Disability benefits" are paid regularly, not as expenses are incurred.*

"[D]isability benefits shall be paid bi-weekly during the first year from the date of disability and paid monthly thereafter." PCC § 5-306(e); *see also* FPDR 5.7.06(A) (same).

4. *"[D]isability benefits" are paid only during the time that a member is employed, and not after retirement, in contrast to medical service reimbursement.*

As provided by PCC section 5-306(f), with certain exceptions, "disability benefits" cease at retirement, the time that a member ceases to be paid wages. *See also* FPDR 5.7.02(D) (disability benefits payable "up to the date [the member] attains Disability Retirement Age").

5. *"[D]isability benefits" may be offset by "wages earned in other employment." FPDR 5.7.12.*

Those "disability benefits" presumably are the equivalent of the member's wage from the bureau.

Thus, "disability benefits" under the charter and rules are lost wages during the period of a disability that are (1) based on the member's rate of pay, (2) paid in the same manner as wages, (3) paid only during the time that the member is employed and not after retirement, and (4) subject to offset by the payment of other wages.

By contrast, medical services reimbursement is not referenced as part of a "disability benefit" under the charter and rules. Instead, that reimbursement is allowed through a supplementary and later process than approval of a claim for disability benefits. PCC section 5-306(g)(2) treats

medical and hospital expense reimbursement as a separate benefit from the payment of disability benefits:

> "For members who are not retired before January 1, 2007, *in addition to the benefits described above*, a member with a service-connected or occupational injury or illness accepted before retirement shall be reimbursed from the Fund for reasonable medical and hospital expenses arising from the injury or illness, as determined by the Fund Administrator. The Fund Administrator may limit reimbursement to particular medical and hospital service providers with which it has made fee arrangements * * *."

(Emphasis added.) The "medical and hospital expenses" are "in addition to the benefits described above"—the lost wages during the period of a disability that are based on the member's rate of pay, paid in the same manner as wages, and paid only during the time that the member is employed and not after retirement. PCC §§ 5-306(a), (d), (e), (f).

The rules treat allowed medical and hospital expense reimbursement through a supplemental and separate process than a claim for disability benefits. Under FPDR 5.7.04(B)(1), after the director approves a claim for disability benefits, a notice is sent to the claimant "that the service-connected injury/illness occurring on the particular date has been approved. The notice also shall include information on how the Member can request reimbursement for covered expenses personally paid for by the Member."

The reimbursement process is further described in a separate chapter (FPDR 5.9.01 *et seq.*). FPDR 5.9.03(A)(1) provides that "Members shall be reimbursed for the actual, reasonable and necessary medical expenses they have paid for or incurred. Payment directly to the medical care provider shall be deemed to be reimbursement of the Member." FPDR 5.9.03(A)(7) regulates the timing of an application for reimbursement of medical expenses: "All requests for reimbursement for expenses paid by the Member must be submitted to and received by the Director within 60 days of making payment for or incurring the expense for which reimbursement is sought." Medical services reimbursement is owed only after a disability benefit claim is approved. Under FPDR 5.9.04, "Medical Services provided to the

injured Member must not be more than is reasonable and necessary to treat the approved service-connected injury/illness." Therefore, an application for disability benefits under FPDR 5.7.03(D) does not seek reimbursement or payment of medical services.

Based on that context, the reviewing court's construction of FPDR 5.7.03 was correct. More specifically, (1) FPDR 5.7.03 limits the time to apply for disability benefits, whether those benefits are sought as part of the initial determination of a disability and qualification of an injury as service-connected or as a determination that a new disability exists and a recurring or aggravated injury is service-connected; (2) the "[a]pplication for disability benefits" under the rule seeks both an allowance of a "claim" (that the member has a disabling service-connected injury or illness) and an award of disability benefits; (3) "disability benefits," as that term is used in FPDR 5.7.03 means only time-loss benefits and not reimbursement of medical and hospital expenses or rehabilitation benefits; (4) in contrast, an application for medical services reimbursement is due "within 60 days of making payment for or incurring the expense for which reimbursement is sought" under FPDR 5.9.03(7); (5) an application under FPDR 5.7.03 for disability benefits for a recurrence seeks a determination that a disability exists and is service-connected, and necessarily cannot be filed and evaluated until a disability exists; (6) the triggering event under FPDR 5.7.03 for a recurrence claim for disability benefits is the occurrence of a disability from a service-connected aggravated injury and the need for disability benefits (that is, time-loss benefits, as opposed to medical services); (7) the deadline is not additionally or otherwise calculated from the time the member became aware that the condition was a worsening of a work-related injury, the time that a physician documents that work-relatedness, or the time that the injury physically worsens; and (8) the triggering event for claimant's application in this case was his disability arising from the October 2009 surgery so that his August 25, 2009, application for benefits was timely.

For those reasons, I concur that the judgment of the reviewing court should be affirmed.