No. 6          February 9, 2017          1

# IN THE SUPREME COURT OF THE STATE OF OREGON

OIL RE-REFINING COMPANY,
*Petitioner on Review,*

*v.*

ENVIRONMENTAL QUALITY COMMISSION,
Department of Environmental Quality
for the State of Oregon,
*Respondent on Review.*

(OAH 1001690, CA A149365, SC S063590)

On judicial review from the Court of Appeals.*

Argued and submitted May 9, 2016.

Aaron J. Bell, Bell Law Firm, P.C., Wilsonville, argued the cause and filed the briefs for the petitioner on review.

Dustin Buehler, Assistant Attorney General, Salem, argued the cause and filed the brief for the respondent on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, and Brewer, Justices, and Ortega, Judge of the Court of Appeals, Justice pro tempore.**

BALMER, C. J.

The decision of the Court of Appeals and the final order of the Environmental Quality Commission are affirmed.

_____
  *  Judicial review of final order of the Environmental Quality Commission. 273 Or App 502, 361 P3d 46 (2015).

  ** Nakamoto, J., did not participate in the consideration or decision of this case.

**BALMER, C. J.**

This case requires us to determine the standard of liability for violations of two provisions of the hazardous waste laws: 40 CFR section 263.20(a)(1), as adopted by OAR 340-100-0002(1), which prohibits a transporter from accepting hazardous waste without a proper manifest form, and ORS 466.095(1)(c), which prohibits operating a hazardous waste treatment site without a proper permit. The Department of Environmental Quality (the department) assessed civil penalties against petitioner, Oil Re-Refining Company (ORRCO), after it determined that ORRCO had accepted hazardous waste without a proper manifest form and treated hazardous waste without a proper permit. ORRCO conceded the factual basis for those allegations but asserted a reasonable-reliance defense—namely, that it reasonably relied on assurances by the generator of the waste that the material ORRCO transported and treated was not a hazardous waste, and, therefore, did not require the manifest and permit at issue. The Environmental Quality Commission (the commission) refused to consider ORRCO's defense, because it interpreted the relevant provisions as imposing a strict liability standard. The Court of Appeals agreed with the commission's interpretations and affirmed its final order finding various violations and imposing civil penalties.[1]

On review before this court, ORRCO argues that the commission should have considered its reasonable-reliance defense and that the commission had erred in interpreting the relevant provisions as imposing a standard of strict liability. We reject ORRCO's argument because it ignores statutory and regulatory context indicating that a transporter's or operator's level of culpability is immaterial

---

[1] The Court of Appeals applied the Oregon regulations in effect at the time of the department's enforcement action in 2009. *Oil Re-Refining Co. v. Environmental Quality Comm.*, 273 Or App 502, 504 n 1, 361 P3d 46 (2015). At that time, the commission had adopted certain federal regulations "promulgated through July 1, 2007." OAR 340-100-0002(1) (2010) (adopting 40 CFR parts 260 to 268 in their entirety, among other provisions). The parties do not ask this court to consider the regulations in effect at the time of the alleged violations. Therefore, consistent with the Court of Appeals decision, our references to state regulations are to those in effect in 2009, and our references to federal regulations are to those as enacted through July 1, 2007.

to establishing a violation of the relevant provisions. We therefore affirm the commission's final order.

## I.    BACKGROUND

The parties do not dispute the facts found by the commission. In or around January 2004, Absorbent Technologies, Inc. (ATI) wanted to discard waste that resulted from its process for making a starch-based soil amendment. In that process, ATI used methanol to extract water from a starch mixture. That resulted in a water/methanol product, which ATI reused to remove water from subsequent loads of the starch mixture. Each additional use increased the concentration of water in the water/methanol product. Eventually, ATI determined that the concentration of water became too high to effectively remove water from loads of the starch mixture. At that point, ATI wanted to discard the resulting water/methanol waste and asked ORRCO to treat it.

ORRCO operated a waste treatment and disposal facility in Portland, subject to a facility management plan approved by the department. Under that plan, ORRCO treated and disposed of certain wastes that fell outside the legal definition of hazardous waste. ORRCO did not have the permit required to operate a facility that treats, stores, or disposes of hazardous waste. *See* ORS 466.095(1) (requiring a permit to treat, store, or dispose of hazardous waste).

In general, ORRCO would not accept waste shipments to its facility until after it ran a number of tests used to detect potential hazardous wastes, including tests to detect the halogen level, pH level, and ignitability of the material. Although it is unclear whether ORRCO performed those tests in this case, ORRCO determined that it could treat ATI's water/methanol waste after sending personnel to tour ATI's facility, receiving an explanation of ATI's manufacturing process, and reviewing paperwork completed by ATI, which described the halogen levels, pH levels, and ignitability of ATI's shipments.

From January to March 2004, ATI delivered seven shipments of its water/methanol waste to ORRCO's facility. The accompanying paperwork—in addition to describing the waste as a mixture of water and methanol—showed

potentially hazardous halogen levels and ignitability. And the paperwork for one shipment showed a potentially hazardous pH level. Further, ATI noted in the paperwork that the water/methanol waste had not been mixed with any other solvents or hazardous wastes, although the paperwork does not state whether the waste itself is a solvent and whether it is hazardous. ORRCO accepted six of the seven deliveries, rejecting only the delivery that showed a high pH level. For each of the six deliveries that it accepted, ORRCO treated the water/methanol waste by burning it for fuel recovery.

After receiving those six deliveries from ATI, ORRCO began picking up the water/methanol waste from ATI's facility and transporting it back to its own facility for treatment. From July to September 2004, ORRCO transported and treated three shipments of ATI's water/methanol waste. Although ATI again provided ORRCO with paperwork describing the characteristics of the material being shipped, ATI did not provide ORRCO with the manifest form required to transport hazardous waste. *See* 40 CFR § 263.20(a)(1), as adopted by OAR 340-100-0002(1) (imposing the manifest requirement).

In 2005, the United States Environmental Protection Agency (EPA) opened an investigation into ATI. That EPA investigation later led the department to investigate ORRCO. In September 2009, after completing its investigation, the department issued a Notice of Civil Penalty Assessment and Order to ORRCO, alleging three violations of the manifest requirement in 40 CFR section 263.20(a)(1), as adopted by OAR 340-100-0002(1), and nine violations of the permit requirement in ORS 466.095(1)(c). ORRCO requested an administrative hearing, which was held in December 2010 before an administrative law judge (ALJ).

At the hearing, ORRCO did not contest the basic facts that it transported and treated the water/methanol waste without a manifest or permit. ORRCO, however, presented numerous legal arguments, including arguing that the water/methanol waste was not a hazardous waste and therefore did not trigger the manifest and permit requirements. Further, ORRCO claimed that, even if the waste was hazardous and the manifest and permit requirements

applied, it did not violate either requirement because it reasonably relied on the information provided by ATI—information that, according to ORRCO, suggested that the water/methanol waste was not hazardous.

The ALJ issued a proposed order, which became the commission's final order. As an initial matter, the commission determined that the water/methanol waste was a hazardous waste, which subjected ORRCO to the manifest and permit requirements. Although the commission concluded that ORRCO relied on information that ATI had provided, the commission never reached the question of whether that reliance was reasonable—that is, whether the information ATI provided actually suggested that the water/methanol waste was not hazardous and, if so, whether ORRCO had reason to believe that ATI's information was incorrect. The commission never reached that question, because it interpreted both the manifest requirement and the permit requirement as imposing strict liability standards, thus making ORRCO's reliance irrelevant to liability. The commission reached that determination because neither requirement specified a particular mental state. As a result, the commission held ORRCO strictly liable for three violations of the manifest requirement in 40 CFR section 263.20(a)(1), as adopted by OAR 340-100-0002(1), and nine violations of the permit requirement in ORS 466.095(1)(c). For those violations, the commission assessed against ORRCO a civil penalty of $118,800.

ORRCO sought review in the Court of Appeals. Before that court, ORRCO did not dispute the commission's findings of fact nor did it contend that the water/methanol waste it transported and treated was not a hazardous waste. Instead, ORRCO argued only that the commission erred by interpreting the manifest and permit requirements to impose strict liability. The Court of Appeals affirmed the commission's order and its interpretations. *Oil Re-Refining Co. v. Environmental Quality Comm.*, 273 Or App 502, 504, 361 P3d 46 (2015).

ORRCO petitioned this court for review, which we granted. On review, ORRCO reasserts the argument it presented to the Court of Appeals—namely, that the manifest

and permit requirements should not impose liability on parties who reasonably rely on assurances from the generator that the waste was not hazardous.[2]

## II.   ANALYSIS

A.   *Law Governing Hazardous Waste*

We begin by placing the manifest and permit requirements within the broader legal framework that governs hazardous waste. Hazardous waste is subject to overlapping state and federal authority. At the federal level, the EPA has promulgated rules implementing the federal Resource Conservation and Recovery Act (RCRA), which amended the Solid Waste Disposal Act, 42 USC sections 6901 to 6992K. Those rules establish criteria for identifying waste as "hazardous waste." If waste is hazardous, it is subject to much stricter requirements than those for nonhazardous waste. *See City of Chicago v. Envtl. Def. Fund*, 511 US 328, 331-32, 114 S Ct 1588, 128 L Ed 2d 302 (1994) (so stating). As it relates to hazardous waste, the EPA has promulgated cradle-to-grave regulations governing handlers of hazardous waste at each stage in its life cycle: waste generators, waste transporters, and owners and operators of waste "treatment, storage, or disposal facilities," known as TSD facilities.

At the state level, hazardous waste is governed by state-run hazardous waste programs authorized by the EPA. 42 USC § 6926(b). The EPA has authorized Oregon to administer its own hazardous waste program, which it does through the commission and the department. ORS 466.086. Under Oregon's program, the department administers, enforces, and implements Oregon's hazardous waste program, and the commission adopts rules and issues orders relating to the hazardous waste program. ORS 466.015; ORS 466.020.

Federal law requires Oregon's program to be at least as stringent as the EPA's RCRA hazardous waste program. 42 USC §§ 6926(b), 6929; *see generally* 40 CFR part 271 (imposing standards for state programs). To comply with

---

[2] Before this court, as before the Court of Appeals, ORRCO does not dispute the commission's conclusion that ATI's water/methanol waste was a hazardous waste.

that requirement, the commission has adopted by reference broad categories of EPA regulations "governing the management of hazardous waste, including its generation, transportation, treatment, storage, recycling and disposal[.]" OAR 340-100-0002(1). Consequently, the commission and the department generally apply the EPA's RCRA rules unless Oregon law, by statute or rule, modifies a rule or specifies some more stringent standard. *Id.*; *see, e.g.*, OAR 340-100-0002(2) (excluding specific EPA rules not at issue in this case). The substance of Oregon's program, therefore, follows the federal cradle-to-grave standards that apply to generators, transporters, and TSD facilities. *See* ORS 466.068 - 466.225 (statutes governing hazardous waste); *see also* ORS 466.086(2) (authorizing the commission to adopt, amend, or repeal rules necessary to obtain and implement a state RCRA program).

The manifest and permit requirements at issue in this case are components in the cradle-to-grave approach required by RCRA. That approach begins with regulations requiring waste generators to determine whether the waste is a solid waste subject to RCRA. If it is, then the generator must determine whether the solid waste is a hazardous waste. 40 CFR § 262.11. Some solid wastes are hazardous because they exhibit characteristics defined as hazardous by the EPA. Other solid wastes are hazardous because the EPA has specifically listed them as hazardous, regardless of the characteristics that they exhibit.

If the generator intends to treat, store, or dispose of its hazardous waste on site, then the generator must obtain a permit to operate a TSD facility. *See* 42 USC § 6925(a) (requiring the EPA to promulgate regulations requiring permits); ORS 466.095(1)(c) (requiring permits for TSD facilities). Obtaining a permit subjects a facility to "the very strict, complex and expensive regulatory requirements of RCRA and parallel state laws." Michael B. Gerrard ed., 4A-29 *Environmental Law Practice Guide* § 29.05 (2015). Regulations govern the manner in which TSD facilities engage in specific operations and impose recordkeeping and emergency planning requirements. *Id.* A generator can

avoid those requirements by shipping its hazardous waste to a TSD facility that already has the appropriate permits.

Shipping hazardous waste raises a host of regulatory requirements intended to track the waste and to protect human health and the environment. Regulations aim to protect human health and the environment by ensuring that the waste is transported safely from the generator to the TSD facility. As a result, if a generator intends to ship hazardous waste to an off-site TSD facility, then the generator is subject to a number of pretransport requirements that address the packaging, labeling, marking, and placarding of the waste. 40 CFR §§ 262.30 - 262.33. Further, a transporter must report discharges of hazardous waste that occur during the shipment. 40 CFR § 263.30.[3]

Regulations also require tracking hazardous waste through a manifest system. The generator is responsible for preparing a manifest form by characterizing the waste's quantity, origin, and composition and identifying the intended route of the waste through registered transporters to the TSD facility that will treat, store, or dispose of it. 40 CFR § 262.20(a)(1). The generator provides copies of the manifest to the transporter. The transporter is prohibited from accepting hazardous waste without a manifest. 40 CFR § 263.20(a)(1). Signed copies of the manifest are created each time hazardous waste is transferred from one handler to another. After accepting hazardous waste, the transporter is generally required to deliver the waste to the next designated transporter or to the TSD facility listed on the manifest. 40 CFR § 263.21(a). TSD facilities receiving shipments of hazardous waste must compare the shipment to the descriptions contained on the manifest and provide proof of receipt to both the transporter and the generator. The manifest system "provides accountability during

---

[3] Those pretransport and reporting requirements were first established by the United States Department of Transportation (USDOT) in rules governing the transportation of hazardous materials, which the EPA later adopted by reference through its RCRA rules. *See* 40 CFR § 262.30 (adopting USDOT regulations related to packaging); 40 CFR § 262.31 (adopting USDOT regulations related to labeling packages); 40 CFR § 262.32 (adopting USDOT regulations related to marking packages); 40 CFR § 262.33 (adopting USDOT regulations related to placarding); 40 CFR § 263.30 (adopting USDOT regulations related to reporting discharges).

each step of the movement of hazardous waste." 45 Fed Reg 12738, 12740 (Feb 26, 1980); *see also* Gerrard, 4A-29 *Environmental Law Practice Guide* § 29.03 ("[T]he manifest system is critical to the functioning of the federal hazardous waste regulatory scheme.").

In this case, the commission concluded that ORRCO violated the manifest requirement imposed on transporters, 40 CFR section 263.20(a)(1), as adopted by OAR 340-100-0002(1), and the permit requirement imposed on TSD facilities, ORS 466.095(1)(c). The commission interpreted both provisions as imposing strict liability standards. ORRCO disagrees with those interpretations. The dispute between the parties thus raises issues of regulatory and statutory construction. ORRCO, however, does not present a separate argument for each provision. Instead, ORRCO directs its argument almost exclusively at the manifest requirement. We therefore begin with the manifest requirement.

B.  *Manifest Requirement*

1.  *Text and interpretative framework*

Before turning to the parties' arguments, we first set out the applicable interpretative framework. To the extent that we apply different interpretative frameworks to state regulations and federal regulations, we must determine whether we are interpreting a state or a federal regulation.[4] Although the substance of the manifest requirement is contained in a federal regulation promulgated by the EPA, 40 CFR section 263.20(a)(1), the manifest requirement is part of Oregon's hazardous waste management program because the commission incorporated that requirement through its own regulation, OAR 340-100-0002(1). That regulation adopts by reference

"the rules and regulations governing the management of hazardous waste, including its \*\*\* transportation, \*\*\*

---

[4] *Compare* State v. Hogevoll, 348 Or 104, 109-10, 228 P3d 569 (2010) (describing standards for interpreting state regulations) *with* Hagan v. Gemstate Manufacturing, Inc., 328 Or 535, 545, 982 P2d 1108 (1999) (describing standards for interpreting federal regulations); *see also* Friends of Columbia Gorge v. Columbia River (S055722), 346 Or 366, 410, 213 P3d 1164 (2009) (comparing federal and state standards of deference owed to an agency's interpretation of its own rule).

prescribed by the United States Environmental Protection Agency in Title 40 Code of Federal Regulations, Parts 260 to 266[.]"

*Id.*

This court has previously noted that "[t]he legislature's incorporation by reference is equivalent to its having republished the specified federal provisions in the state statutes." *Okorn v. Dept. of Rev.*, 312 Or 152, 155, 818 P2d 928 (1991). The same reasoning applies to administrative rules: when an agency promulgates a rule that incorporates a federal rule by reference, the agency's incorporation is equivalent to republishing the referenced federal rule in the agency's own rule. Thus, when the commission determined that ORRCO violated the standard of conduct set forth in 40 CFR section 263.20(a)(1), the commission was applying state law. *See Okorn*, 312 Or at 155 (explaining that the Department of Revenue "was making a determination of state law" when it enforced a state income tax law that incorporated federal standards for defining taxable income).

We therefore apply our framework for interpreting state regulations. In applying that framework, however, we encounter another question: whether the commission's interpretation of the manifest requirement is entitled to deference. Within our framework for interpreting state regulations, this court ordinarily defers to an agency's interpretation of its own regulation if that interpretation is a plausible one and otherwise consistent with the law. *AT&T Corp. v. Dept. of Rev.*, 357 Or 691, 702, 358 P3d 973 (2015). Although the commission was technically interpreting its own regulation when it applied the standard of conduct set forth in 40 CFR section 263.20(a)(1), that does not necessarily mean that the commission's interpretation is entitled to deference.

The commission asserts, in a footnote and without argument, that its interpretation is entitled to deference because it promulgated the state rule (OAR 340-100-0002(1)) that incorporates the federal rule (40 CFR section 263.20(a)(1)) containing the manifest requirement's standard of conduct. This court has not previously addressed the question of whether we should defer to an agency's interpretation of a federal rule that the agency has incorporated into its own rule

by reference. *See Brand Energy Services, LLC v. OR-OSHA*, 261 Or App 210, 215 n 5, 323 P3d 356 (2014) (noting the lack of Oregon case law). And neither party briefed that question. For example, the commission does not argue that it had the statutory authority to do anything other than simply incorporate the standards of conduct contained in the EPA's RCRA regulations, including the manifest requirement in 40 CFR section 263.20(a)(1).[5] In other words, it is at least potentially relevant to know whether the commission was required by law to incorporate 40 CFR section 263.20(a)(1) or whether it chose to incorporate that provision based on its expertise in hazardous waste management and its legislatively delegated policy-making authority.[6]

We can resolve the parties' dispute in this case, however, without resolving the question of whether to defer to the commission's interpretation of the manifest requirement. On the issue disputed in this case—the propriety of a strict liability standard—we conclude, for the reasons explained below, that the manifest requirement permits

---

[5] It is not clear what statutory authority the commission relied on when it adopted the federal manifest requirement imposed on transporters. None of the statutes cited in OAR 340-100-0002(1) clearly provide such authority. Among the cited statutes—ORS 465.009, ORS 465.505, or ORS 466.020—only two provisions address transportation. Those provisions authorize the commission to adopt rules "relating to the transportation of hazardous waste by air or water," ORS 466.020(5), and to adopt rules relating to the "transportation *** of fuels containing or derived from hazardous waste," ORS 466.020(6). Authority could be found in other statutes. For example, ORS 466.086(2) authorizes the commission to adopt rules "necessary" to gain the EPA's authorization of a state-run RCRA program, although the extent to which the commission could rely on that statute for any particular rule would require considering the scope of authority provided by the statute.

[6] Other courts have addressed similar issues. For example, in *Gonzales v. Oregon*, 546 US 243, 126 S Ct 904, 163 L Ed 2d 748 (2006), the United States Supreme Court denied deference to an agency's interpretation of its own "parroting regulation," which is a regulation that copies or paraphrases the statutory standard that the agency was implementing. *Id.* at 257. According to that court, "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Id.* On the other hand, federal courts have deferred to an agency's interpretation of its own regulation that parrots wording developed by another agency or entity, reasoning that "the doctrine of deference is based primarily on the agency's statutory role as the sponsor of the regulation, not necessarily on its drafting expertise." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F3d 579, 585 (DC Cir 1997) *abrogated on other grounds by Perez v. Mortgage Bankers Ass'n*, ___ US ___, 135 S Ct 1199, 191 L Ed 2d 186 (2015).

only one plausible interpretation, which is the interpretation adopted by the commission. That conclusion moots the question of deference, because we would affirm the commission's interpretation regardless of whether we gave deference to that interpretation.

We determine whether an agency regulation is susceptible to more than one plausible interpretation of the issue in dispute by applying "the same analytical framework that applies to the construction of statutes." *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010). Therefore, as it relates to the propriety of a strict liability standard, we attempt to identify the meaning of the text in context and to give effect to the intent of the enacting body—in this case, the commission. *Wetherell v. Douglas County*, 342 Or 666, 678, 160 P3d 614 (2007). Although we look at the intent of the commission, that does not preclude considering the meaning that the EPA intended to give, or has given, to the manifest requirement contained in 40 CFR section 263.20(a)(1). Rather, the rule-making history and subsequent interpretation of the EPA's manifest requirement is relevant to the extent that it informs the commission's intent when it adopted the manifest requirement. *See* ORS 466.086(2) (granting the commission authority to adopt rules necessary for Oregon to gain the EPA's authorization of a state-run RCRA program); *see also State v. Cooper*, 319 Or 162, 168, 874 P2d 822 (1994) (resolving a dispute over the meaning of an Oregon rule of evidence by considering congressional intent of federal rule of evidence that served as model).

With that framework in mind, we turn to the text of the manifest requirement. That provision states:

> "Manifest requirement. A transporter may not accept hazardous waste from a generator unless the transporter is also provided with a manifest signed in accordance with the requirement of § 262.23."

40 CFR § 263.20(a)(1), *as adopted* OAR 340-100-0002(1).

As noted, the commission concluded that the manifest requirement imposed a strict liability standard, because the rule does not specify that a particular mental state is required to establish a violation. ORRCO challenges that

interpretation of the manifest requirement and argues that the commission should have considered its defense claiming that it reasonably relied on information provided to it by ATI, which, according to ORRCO, suggested that the manifest requirement did not apply. In asserting that argument, ORRCO relies on context created by two sources: 40 CFR section 262.11, which requires a waste generator to determine whether waste is hazardous, and statutes and rules enforced by the United States Department of Transportation (USDOT), which expressly allow for a reasonable-reliance defense.

### 2.    *Culpability in state and federal RCRA enforcement*

The commission is, of course, correct that the manifest requirement itself does not identify a particular mental state or level of culpability necessary to establish a violation. That omission, however, would not necessarily be given decisive weight if a contrary intent were revealed by the rule's statutory and regulatory context—namely, the remaining statutes and rules that comprise the rest of Oregon's hazardous waste program. *See Gafur v. Legacy Good Samaritan Hospital*, 344 Or 525, 533, 185 P3d 446 (2008) (identifying context of an administrative rule as including "other provisions of the same rule, other related rules, the statute pursuant to which the rule was created, and other related statutes").

When we expand the analysis to the rule's statutory and regulatory context, we discover substantial support for the commission's strict liability interpretation. In particular, the legislature and the commission established a regulatory scheme that imposes numerous substantive standards—requiring or prohibiting certain specific conduct—and then authorized the department to enforce those substantive standards through different types of offenses. The primary factor distinguishing the offenses is the level of culpability of the party that breached the substantive standard. As a party's culpability increases, so does the authorized penalty.

In this case, the substantive standard is contained in the manifest requirement, which prohibits transporters from accepting hazardous waste without a manifest. The

legislature and the commission have established two civil offenses to enforce that substantive standard: a violation and a more egregious violation, known as an "extreme violation." Under authority provided by the legislature, ORS 468.130(1), the department may "assess a civil penalty for any violation." OAR 340-012-0045; *see also* OAR 340-012-0068(1)(e) (defining a Class I violation as including "[a]ccepting, transporting or offering for transport hazardous waste without a uniform hazardous waste manifest"). Under that provision, which is what the department used to assess a penalty against ORRCO in this case, the department's authority to assess a civil penalty for a violation is not subject to a culpability requirement. At the time of enforcement, the department was authorized to assess a penalty of up to $10,000. ORS 468.130(1).

However, if the department presents evidence of a party's culpable mental state, it can establish an extreme violation. ORS 468.996(1). A party commits an extreme violation by "intentionally or recklessly violat[ing]" hazardous waste laws that "results in or creates the imminent likelihood for an extreme hazard to the public health or which causes extensive damage to the environment." *Id.* If the department determines that a party has committed an extreme violation, then it may assess a penalty of up to $100,000. *Id.*; OAR 340-012-0155(1) (same).

In addition to those civil offenses, the legislature also has established two criminal offenses related to the manifest requirement and has made a defendant's culpable mental state an element of those offenses as well. If a party knowingly transports hazardous waste in violation of hazardous waste laws, then that party may be guilty of "unlawful transport of hazardous waste in the second degree." ORS 468.929(1). That offense is a Class B misdemeanor, which would subject the party to a penalty of up to six months in prison, a $10,000 fine, or both. ORS 468.929(2); ORS 161.615(2). And if, while knowingly transporting hazardous waste in violation of hazardous waste laws, a party also "recklessly causes substantial harm to human health or the environment" or "[k]nowingly disregards the law in committing the violation," then that party may be guilty of

"unlawful transport of hazardous waste in the first degree." ORS 468.931(1). That offense is a Class B felony, which subjects the party to a penalty of up to 10 years in prison, a $250,000 fine, or both. ORS 161.605(2); ORS 161.625(1)(c).

The fact that lawmakers expressly chose to require evidence of culpable mental states for extreme violations and criminal offenses but not for simple violations strongly suggests that lawmakers intended to authorize the department to bring enforcement actions for simple violations without evidence of a culpable mental state. That reading is further supported by the statutes and regulations identifying the factors that must be considered when assessing a civil penalty.

In ORS 468.130(2)(f), the legislature directed the commission to consider a respondent's culpability when determining the amount of the fine to impose—specifically, to consider "[w]hether the cause of the violation was an unavoidable accident, negligence or an intentional act." Within the context of that statute, "unavoidable accident" is best understood as referring to a violation that does not result from a respondent's negligent or intentional conduct. *See, e.g.*, *Restatement (Second) of Torts* § 8 (1965) ("The words 'unavoidable accident' are used throughout the Restatement of this Subject to denote the fact that the harm which is so described is not caused by any tortious act of the one whose conduct is in question.").

The commission has adopted rules carrying out that legislative direction. Subject to exceptions not relevant here, those rules require the department to calculate a civil penalty according to a multifactor formula that looks at the class and magnitude of the violation, the economic benefit received by the respondent, and certain mitigating and aggravating factors. OAR 340-012-0045. A respondent's level of culpability is one of those potentially aggravating factors that may increase a respondent's penalty. OAR 340-012-0145(5). With regard to culpability, the greatest increase results from a finding that the respondent acted flagrantly. OAR 340-012-0145(5)(a)(D). Smaller amounts are added if the respondent acted recklessly, negligently, or with constructive knowledge. OAR 340-012-0145(5)(a)(B)-(C). If the

department presents insufficient evidence to establish that the respondent acted with any culpable mental state, then the commission does not increase the respondent's penalty to account for the respondent's mental state. OAR 340-012-0145(5)(a)(A).[7]

Together, the provisions indicate that, as it relates to simple violations, a respondent's level of culpability is a penalty factor rather than a liability factor. In other words, a respondent's level of culpability may be used to determine the amount of the fine assessed for a violation, but it is not used to determine whether a respondent has violated a substantive standard in the first place.

That reading is consistent with the analogous federal RCRA program, which provides the baseline level of stringency for Oregon's hazardous waste program. 42 USC §§ 6926(b), 6929 (requiring state programs to be at least as stringent as the federal RCRA program). Congress established separate offenses for hazardous waste violations based on a party's culpable mental state. Under 42 USC section 6928(d)(5), a party who knowingly transports hazardous waste without a manifest may be subject to criminal penalties. *See also* 42 USC § 6928(e) (establishing crime of knowing endangerment based on violation of manifest requirement). But establishing liability for a civil penalty requires no such mental state. In 42 USC section 6928(g), Congress provided, "Any person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation."[8] Because Congress included a "knowing" standard

---

[7] Before the commission, the parties disputed this penalty factor. The department alleged that ORRCO acted intentionally, while ORRCO contended that it acted reasonably—*i.e.*, that the department presented insufficient evidence to establish that ORRCO acted with any culpable mental state. The commission, however, did not resolve that dispute, because its resolution would not have affected the penalty assessed. By statute, the commission was authorized to assess a maximum penalty of $10,000 per violation. The penalty factors that the commission did consider already pushed ORRCO beyond that maximum penalty. As a result, the commission determined that the culpability penalty factor was irrelevant.

[8] That statute was modeled after the civil liability provision under the Clean Water Act, 33 USC section 1319(d). *United States v. Liviola*, 605 F Supp 96, 100 (ND Ohio 1985). Courts uniformly interpret that provision as imposing strict liability. *See Kelly v. U.S. E.P.A.*, 203 F3d 519, 522 (7th Cir 2000) (collecting cases applying the Clean Water Act).

in the provision establishing criminal penalties but omitted a culpability standard in the provision establishing civil penalties, courts have not required evidence of a culpable mental state to impose civil penalties under RCRA. *See, e.g.*, *United States v. Charles George Trucking Co., Inc.*, 642 F Supp 329, 333-34 (D Mass 1986) (contrasting criminal liability and noting that "the imposition of the § 6928(g) penalty does not require a finding of scienter"); *United States v. Liviola*, 605 F Supp 96, 100 (ND Ohio 1985) ("[T]he explicit language of RCRA requires willful intent only for criminal penalties under §§ 6928(d) and (e); had Congress desired to impose such a prerequisite for civil penalties, it would have done so.").

And, as within the state scheme, Congress relegated a party's level of culpability to influencing the civil penalty amount, rather than determining whether a violation occurred in the first place. *See* 42 USC § 6928(a) ("In assessing such a penalty, the Administrator shall take into account the seriousness of the violation and any good faith efforts to comply with applicable requirements."); *U.S. EPA v. Environmental Waste Control, Inc.*, 710 F Supp 1172, 1213 (ND Ind 1989), *aff'd sub nom. U.S. EPA v. Environmental Waste Control, Inc.*, 917 F2d 327 (7th Cir 1990) (holding that the respondent's "efforts to determine the insurance coverage required by RCRA regulations are pertinent to the scope of relief and penalties" but such "good faith in making those efforts, are not relevant to determining whether [respondent] complied with those regulations").

Thus, RCRA's civil enforcement provision, 42 USC section 6928(g), establishes a strict liability standard for simple violations. Courts have repeatedly confirmed that reading. *See, e.g., United States v. JG-24, Inc.*, 331 F Supp 2d 14, 70 (DPR 2004), *aff'd*, 478 F3d 28 (1st Cir 2007) ("Civil liability under RCRA is strict[.]"); *United States v. Domestic Industries, Inc.*, 32 F Supp 2d 855, 866 (ED Va 1999) ("RCRA provides for strict liability."); *United States v. Allegan Metal Finishing Co.*, 696 F Supp 275, 287 (WD Mich 1988) ("[T]he civil violations of RCRA provisions are properly characterized as strict liability offenses."); *United States v. Vineland Chem. Co., Inc.*, CIV. A. 86-1936, 1990 WL 157509,

at *10 (D NJ Apr 30, 1990), *aff'd*, 931 F2d 52 (3d Cir 1991) ("Defendants are strictly liable for RCRA violations.").[9]

ORRCO does not cite any case law, administrative guidance, or legislative history suggesting that RCRA's civil enforcement provision, 42 USC section 6928(g), is anything other than a strict liability statute. Instead, ORRCO contends that reading that provision as imposing a strict liability standard would be unfair and ineffective as a deterrent because, according to ORRCO, it may be impossible in many cases for the transporter to know whether the material it is transporting is hazardous waste triggering the manifest requirement.

Contrary to ORRCO's contention, however, courts have rejected impossibility as a defense to RCRA civil enforcement. *See, e.g.*, *Domestic Indus., Inc.*, 32 F Supp 2d at 867 n 8 ("[I]t is not a defense to argue that compliance with the RCRA regulations was impossible."). Moreover, in our view, such an enforcement scheme is not inherently unfair. If a transporter relies on another's characterization of the waste, the transporter could seek indemnification to account for the risk that the characterization is wrong. And the EPA maintains discretion not to bring cases if doing so would result in substantial inequities.

Further, it is not unreasonable to think that a strict liability standard is necessary to carry out the deterrence intended by Congress. *See JG-24, Inc.*, 331 F Supp 2d at 70 (stating that "[a] central purpose of civil penalties under RCRA is deterrence"). "Although directed in part to the violators themselves, the deterrent value of a substantial civil penalty is focused squarely on others to whom the law also applies." *Id.* Thus, although a strict liability standard may have little effect on a transporter who takes great care to avoid violations, such a standard may be necessary to deter

---

[9] The only decision this court could find addressing the scope of the manifest requirement is a decision by the Massachusetts Department of Environmental Protection, *In the Matter of: D&J Transportation Specialists, Inc.*, 1991 WL 438196 (Jan 9, 1991). Applying an analogous state regulation, the Massachusetts Department of Environmental Protection rejected a respondent's reasonable-reliance defense: "[T]here would be no rationale under customary interpretations of analogous laws to read into Chapter 21C a knowledge requirement which is not set forth in the statute or its implementing regulations." *Id.* at *4.

transporters who could act with more care but who fail to do so because they believe that the EPA would have difficulty proving a negligent or intentional mental state.

For example, traffic violations are often strict liability offenses. *See State v. Stroup*, 290 Or 185, 202 n 14, 620 P2d 1359 (1980) (so noting). It might be difficult for a driver to know immediately if his or her brake light has stopped working. But it might also be difficult for a police officer to gather evidence establishing that the driver knew, or should have known, that his or her brake light had stopped working at the time of the traffic stop. Because of the low risk of enforcement in that hypothetical circumstance, a negligence or intentionality standard would not operate as an effective deterrent to a driver who knew, or should have known, of the broken brake light. And deterrence is of particular concern in violations that affect the public welfare, such as traffic violations. *Id.*

Courts have similarly considered the public welfare effects of environmental violations when imposing a strict liability standard under RCRA's civil enforcement provision. *See, e.g.*, *Domestic Industries, Inc.*, 32 F Supp 2d at 867 ("As the Supreme Court noted *Liporata v. United States*, 471 US 419, 433, 105 S Ct 2084, 85 LEd 2d 434 (1985), statutes designed to protect the public health and welfare are more likely candidates for diminished mens rea requirements. RCRA and other similar environmental protection statutes fall within this category.").

Thus, the enforcement scheme intended by the legislature and the commission, as well as by Congress and the EPA, provides a compelling basis for affirming the commission's strict liability interpretation. ORRCO nevertheless argues against that reading based on additional context provided by 40 CFR section 262.11 and rules adopted by USDOT.

3. *40 CFR section 262.11*

First, ORRCO relies on 40 CFR section 262.11, which was promulgated by the EPA as part of its RCRA program and adopted by the commission through OAR 340-100-0002(1). Under 40 CFR section 262.11, a generator of

solid waste must determine whether the waste is hazardous or nonhazardous. *Id.* ("A person who generates a solid waste, as defined in 40 CFR 261.2, must determine if that waste is a hazardous waste using [a particular] method[.]"). The manifest requirement only applies to hazardous waste. Thus, if a transporter reasonably relies on a generator's determination that the waste is not hazardous, then the transporter would not know that the manifest requirement applies in the first place. According to ORRCO, imposing liability on a transporter in that circumstance would, in effect, require a transporter to make its own independent determination about whether the waste is hazardous waste, even though a transporter is often in a worse position than the generator to make that determination.[10]

Contrary to ORRCO's characterization, however, the requirement imposed on generators under 40 CFR section 262.11 is distinct from the manifest requirement imposed on transporters under 40 CFR section 263.20(a)(1). The former requires determining whether waste is hazardous and the latter prohibits accepting hazardous waste without a manifest. ORRCO improperly conflates those provisions because a generator who fails to properly determine whether waste is hazardous might cause a transporter to accept hazardous waste without a manifest, even if the transporter has taken all reasonable precautions—or even extraordinary precautions—to comply with the law. In that sense, a generator who violates 40 CFR section 262.11 may be the party at fault for a transporter's separate violation of the manifest requirement in 40 CFR section 263.20(a)(1).

ORRCO's argument presumes that fault is relevant, but ORRCO fails to explain how 40 CFR section 262.11 makes fault relevant. Fault would be relevant only if the manifest requirement were subject to a liability standard

_____

[10] ORRCO further points out that there are circumstances in which, by law, transporters are required to make a determination about whether waste is hazardous: (1) when a transporter imports waste from a foreign country outside of the EPA's jurisdiction; (2) when a transporter mixes different wastes, potentially making waste hazardous that was nonhazardous when the transporter accepted it. 40 CFR § 263.10(c). ORRCO contends that, because this case is not one of those circumstances, it should not be required to make that its own independent determination about whether the waste is hazardous.

other than strict liability, such as negligence or intent. A strict liability standard is distinct from other standards specifically because it allows liability to be imposed without a finding of fault. *See, e.g.*, *Restatement (Third) of Torts: Phys. & Emot. Harm* ch. 4 Scope Note (2010) ("[L]iability for negligence or for intent is liability based on fault. By contrast, strict liability signifies liability without fault, or at least without any proof of fault."). By premising its argument on fault being a relevant consideration, ORRCO begs the question of whether the manifest requirement is subject to a strict liability standard and, thus, fails to counter the analysis above, which suggests that the manifest requirement is subject to strict liability.[11]

### 4. *Statutes and rules enforced by the USDOT*

ORRCO makes a second contextual argument, however. ORRCO argues that, regardless of whether RCRA's civil enforcement provision establishes a strict liability standard in general, that standard should not be applied to the manifest requirement. ORRCO contends that, because the manifest requirement is an EPA regulation imposed on transporters, it must be reconciled with companion statutes and rules enforced by the USDOT: the Hazardous Material Transportation Act (HMTA), as amended and codified in 49 USC section 5101 *et seq.*, and the USDOT's hazardous materials regulations adopted pursuant to that act, 49 CFR parts 100 to 180.

---

[11] ORRCO's reliance on *Crockett v. Uniroyal, Inc.*, 772 F2d 1524 (11th Cir 1985), where the court accepted a transporter's reasonable-reliance defense, is similarly misplaced. There, a transporter consigned a railcar to a third party. Although the railcar contained residue of poison that had previously been shipped in the car, the transporter provided the third party with paperwork, completed based on information provided by the waste generator, stating that the railcar was empty. The third party sued the generator for negligence after suffering injuries from the poison residue remaining in the railcar. The generator then sued the transporter based on indemnity and contribution—claims that turned on whether the transporter's conduct was negligent. *Id.* at 1531. In considering the generator's claims against the transporter, the court noted that EPA regulations did not require a transporter to make an independent determination of whether the material being transported was hazardous waste and accepted the transporter's reasonable-reliance defense against the allegation that the transporter acted negligently. *Id.* at 1534. Thus, *Crockett* would be relevant only if the standard of liability in this case were negligence. But *Crockett* does not speak to the issue before us—namely, determining what standard of liability should apply in the first place—nor does it involve agency enforcement of a waste regulation.

ORRCO points out that, although Congress authorized the EPA to promulgate rules applied to transporters of hazardous waste, Congress required the EPA to ensure that its rules are "consistent with the requirements" imposed by USDOT, 42 USC section 6923(b). One of the rules adopted by the EPA that must be consistent with USDOT regulations is the EPA's manifest requirement. *See* 42 USC § 6923(a)(3) (so stating). USDOT promulgated a manifest requirement that is almost identical to the EPA's manifest requirement:

> "No person may offer, transport, transfer, or deliver a hazardous waste (waste) unless * * * [a] hazardous waste manifest (manifest) is prepared in accordance with 40 CFR 262.20 and is signed, carried, and given as required of that person by this section."

49 CFR § 172.205(a); *see also* 49 CFR § 171.3(b)(2) (requiring transporters to comply with 49 CFR § 172.205(a)).

Although USDOT has used wording similar to the EPA's manifest requirement, USDOT has stated that its manifest requirement and other requirements imposed on transporters are not subject to a strict liability standard. In 1998, USDOT issued a formal interpretation of its regulations governing transporters who accept hazardous materials, including hazardous waste. 63 Fed Reg 30411 (June 4, 1998). In that formal interpretation, USDOT explains that a civil penalty will be assessed only against transporters who *knowingly* violate those regulations, thus permitting a reasonable-reliance defense:

> "[A]n offeror who fails to properly declare (and prepare) a shipment of hazardous materials bears the primary responsibility for a hidden shipment. Whenever hazardous materials have not been shipped in compliance with the HMR, DOT generally will attempt to identify and bring an enforcement proceeding against the person who first caused the transportation of a noncomplying shipment.
>
> "* * * * *
>
> "To the extent that any carrier, regardless of the mode of transportation, is truly 'innocent' in accepting an undeclared or hidden shipment of hazardous materials, it lacks the knowledge required for assessment of a civil penalty."

*Id.* at 30412.

ORRCO argues that, to be consistent with USDOT's manifest requirement, the EPA's manifest requirement must be read to allow a civil penalty only if the transporter acts knowingly. And, if we must read the EPA's manifest requirement as imposing a knowledge standard, then we should assume that the commission intended to adopt that knowledge standard when it adopted the EPA's manifest requirement by reference in OAR 340-100-0002(1).

We reject ORRCO's argument because it ignores the source of USDOT's knowledge standard—namely, USDOT's civil enforcement statute, 49 USC section 5123(a). Under that provision, USDOT can assess a civil penalty only against "[a] person that *knowingly* violates" the USDOT's hazardous materials rules. (Emphasis added.) Thus, USDOT does not assess liability on transporters who unknowingly accept hazardous waste without a manifest because USDOT has no authority to do so. The USDOT formal interpretation that ORRCO relies on, 63 Fed Reg at 30412, is not a formal interpretation of the manifest requirement or any other substantive regulation imposed on transporters. Instead, it is an application of USDOT's civil enforcement provision. *See id.* (noting that USDOT has "the authority in 49 U.S.C. 5123 to assess a civil penalty against any person who 'knowingly violates' any requirement in the [hazardous materials rules]"). As a result, that formal interpretation merely recognizes a limit that Congress placed on USDOT's authority to assess civil penalties. But Congress placed no such limit on the authority that it granted the EPA to enforce RCRA.

The manifest requirements imposed by the commission, the EPA, and the USDOT are consistent. They each prohibit a transporter from transporting hazardous waste without a manifest. 49 CFR § 172.205(a); 40 CFR § 263.20(a)(1), as adopted by OAR 340-100-0002(1). A transporter who transports hazardous waste without a manifest violates each of those provisions. The difference is that the commission and the EPA have the authority to assess a penalty for such a violation, but USDOT has the authority to assess such a penalty only if the violation was knowing.[12]

---

[12] Because we hold that the EPA's and the commission's manifest requirement in 40 CFR section 263.20(a)(1), as adopted by OAR 340-100-0002(1), is consistent

That difference does not make the subject provisions incompatible or contradictory.

ORRCO additionally relies on a 2005 rule amendment by USDOT expressly acknowledging that transporters may reasonably rely on information provided by generators. *See* 70 Fed Reg 43638, 43644 (July 28, 2005) (amending 49 CFR § 171.2(f)); 49 CFR § 171.2(f) ("Each carrier who transports a hazardous material in commerce may rely on information provided by the offeror of the hazardous material or a prior carrier, unless the carrier knows or, a reasonable person, acting in the circumstances and exercising reasonable care, would have knowledge that the information provided by the offeror or prior carrier is incorrect.").

That amendment, however, does not change our analysis. The amendment applies to all USDOT rules and is not specific to the manifest requirement. At the time of its adoption, USDOT stated that the amendment merely reflected the limits imposed on its statutory enforcement authority by the knowledge standard described above. *See* 70 Fed Reg at 43639 ("[T]he language proposed in § 171.2 should reflect the standard for 'knowingly' established in Federal hazmat law. Therefore, in this final rule, we are revising paragraphs (b) and (f) of § 171.2 (proposed as paragraphs (a) and (b) of § 171.2 in the NPRM) for consistency with Federal hazmat law."). USDOT viewed the amendment as a clarification of existing law, rather than a change in its substantive law. *Id.* at 43639 ("[T]he [notice of proposed rulemaking] proposed to clarify in § 171.2 that an offeror or carrier of a hazardous material may rely on information provided by a previous offeror or carrier in the absence of knowledge that the information is incorrect."). And ORRCO has not identified any source indicating that the EPA has regarded the amendment as one that requires a change to the EPA's own regulations.

---

with the USDOT's manifest requirement in 49 CFR section 172.205(a), we need not assess the legislative and administrative history that ORRCO cites, which includes that the EPA's regulations must be consistent with USDOT's regulations. We also need not assess ORRCO's reliance on *New York v. United States Department of Transportation*, 37 F Supp 2d 152 (NDNY 1999), a case about the scope of the USDOT's authority to preempt state laws that create obstacles to carrying out or complying with the HMTA.

Because we reject ORRCO's arguments and because the statutory and regulatory context of the manifest requirement overwhelmingly suggest an intent to subject simple violations of the manifest requirement to a strict liability standard, we affirm the commission's strict liability interpretation of the manifest requirement.

B.    *Permit Requirement*

As noted above, the commission found ORRCO strictly liable both for violations of the manifest requirement in 40 CFR section 263.20(a)(1), as adopted by OAR 340-100-0002(1), and for violations of the permit requirement in ORS 466.095(1)(c). ORRCO substantially ignores the permit requirement, ORS 466.095(1)(c), in its briefing, relying entirely on the arguments it made with respect to the manifest requirement. Those arguments fail here as well.

In contrast to the manifest requirement, which appears in a regulation, the permit requirement is contained in a state statute, ORS 466.095(1)(c):

"[N]o person shall *** [e]stablish, construct or operate a hazardous waste treatment site in this state without obtaining a hazardous waste treatment site permit issued pursuant to ORS 466.005 to 466.385 and 466.992."

*Id.*

We generally interpret statutes by "examin[ing] the statutory text in context, along with its legislative history, applying as needed relevant rules and canons of construction." *Lake Oswego Preservation Society v. City of Lake Oswego*, 360 Or 115, 124, 379 P3d 462 (2016). Although the commission enforces that statute, the commission concedes that its interpretation of the permit requirement is not entitled to deference. *See OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 585, 341 P3d 701 (2014) (identifying circumstances justifying deference to an agency's statutory construction).

The permit requirement is subject to the same regulatory framework that applies to the manifest requirement identified above. The department enforced the permit requirement by assessing a penalty against ORRCO under its legislatively delegated authority to "assess a civil penalty

for any violation." OAR 340-012-0045; *see* ORS 468.130(1) (providing legislative authorization); *see also* OAR 340-012-0068(1)(c) (defining a Class I violation as including "[o]perating a hazardous waste treatment, storage or disposal facility (TSD) without first obtaining a permit or without having interim status"). The department's authority to assess a penalty for a simple violation is not subject to a culpable mental state requirement, such as those defining an "extreme violation," ORS 468.996(1), or related criminal offenses, ORS 468.922(1) (defining unlawful treatment of hazardous waste in the second degree); ORS 468.926(1) (defining unlawful treatment of hazardous waste in the first degree). Instead, as it relates to simple violations, the legislature has made culpability a penalty factor rather than a liability factor. ORS 468.130(2)(f); *see also* OAR 340-012-0145(5) (identifying culpability as a factor increasing a respondent's civil penalty).

Because the permit requirement is subject to the same regulatory framework that applies to the manifest requirement, we reject ORRCO's arguments as to the permit requirement for the same reason that we have rejected them as to the manifest requirement. Further, decisions applying the analogous rule within the EPA's RCRA program have similarly concluded that the provision is subject to a strict liability standard. *See, e.g.*, *Domestic Industries, Inc.*, 32 F Supp 2d at 868 (applying the federal permit requirement and noting that "[t]here is no explicit knowledge requirement for liability under this section of RCRA"); *In the Matter of Gary Development Co.*, RCRA-V-W-86-R-45, 1996 WL 316510, at *14 (EPA Apr 8, 1996) ("RCRA is a strict liability statute, and acceptance of hazardous waste for disposal, whether knowingly or not, requires that all applicable regulatory requirements for hazardous waste disposal be met.").[13]

For the foregoing reasons, we reject ORRCO's argument that, because it reasonably relied on assurances from

---

[13] *See also* Gerrard, 4A-29 *Environmental Law Practice Guide* § 29.05 ("The full brunt of EPA's enforcement efforts under RCRA tends to be focused on the owners and operators of TSD facilities, who will be held *strictly liable* to comply with the literal language of the regulations and the TSD permits. Non-negligent TSD civil violations, even where no meaningful environmental damage is done, are increasingly resulting in the assessment of civil penalties in the six or seven figure range." (Emphasis added.)).

the generator of the material that it transported and disposed of that the material was not hazardous waste, it did not violate the hazardous waste laws as charged by the department.

The decision of the Court of Appeals and the final order of the Environmental Quality Commission are affirmed.