Submitted February 5, 2018, affirmed February 20, petition for review denied June 4, 2020 (366 Or 552)

GROWING GREEN PANDA,
*Petitioner,*

*v.*

DEPARTMENT OF HUMAN SERVICES,
*Respondent.*

Department of Human Services
2016DHS02149, 2016DHS02574;
A164165

461 P3d 1026

Petitioner seeks judicial review of a Department of Human Services (DHS) final order that terminated the subsidy payments that petitioner had been receiving as a child-care provider for low-income families. DHS terminated petitioner's payments because it determined that petitioner's principal and owner failed to report, as required by DHS's regulation, that she had been arrested after she voluntarily appeared in court for an arraignment and completed a court-ordered book-and-release process. On review, petitioner argues that its owner was not arrested, and that DHS erroneously interpreted the term "arrest" in its own regulation to conclude that she was. DHS contends, however, that its interpretation is plausible and warrants deference. *Held*: The Court of Appeals defers to DHS's interpretation of the term "arrest" in its regulation, because that interpretation is plausible.

Affirmed.

Kevin O'Connell and Hagen O'Connell & Hval LLP filed the briefs for petitioner.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patrick M. Ebbett, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.

DEHOOG, P. J.

Affirmed.

**DEHOOG, P. J.**

Petitioner, a child-care provider for low-income families, seeks judicial review of a Department of Human Services (DHS) final order. In its order, DHS terminated petitioner's Employment Related Day Care (ERDC) subsidy payments after determining that petitioner had failed to comply with a condition of eligibility under OAR 461-165-0180 (7)(h)(A) (July 1, 2016).[1] DHS construed that rule to require petitioner to disclose that its principal and owner, Andrea Stephens-Bontemps, had been subject to an "arrest" after she voluntarily appeared in circuit court to be arraigned on an indictment and completed a court-ordered book-and-release process. On judicial review, petitioner argues that DHS misconstrued the term "arrest" as it appeared in the rule. DHS responds that its final order sets forth a plausible interpretation of its own regulation to which we must defer. We conclude that DHS's interpretation of its own rule is plausible. Accordingly, we affirm.

Under the Administrative Procedures Act, ORS 183.310 to 183.690, "[r]eview of a contested case shall be confined to the record, and the court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion." ORS 183.482(7). Because, with one notable exception that we address below, petitioner does not dispute that the record supports DHS's factual findings, we accept the facts set out in DHS's final order and state them accordingly.

Stephens-Bontemps was petitioner's principal and owner and personally provided day care for children at petitioner's facility. Petitioner itself was listed as an eligible child-care provider with DHS and received ERDC subsidy payments from the Direct Pay Unit.[2] Due to her role

---

[1] DHS amended OAR 461-165-0180 after issuing its final order in this case. The relevant reporting requirements are now listed in OAR 461-165-0180(8)(h) and have been expanded in a way that, if applicable, would affect the outcome here. Because no party has suggested that those changes are applicable here, we consider only the version of the administrative rules in effect in 2016, when DHS terminated petitioner's ERDC subsidy payments; all subsequent citations to the rules are to that earlier version.

[2] The ERDC program is designed to help "low-income working families pay the cost of child care." OAR 461-101-0010(7).

within the business and her direct involvement with child care at petitioner's day-care center, Stephens-Bontemps qualified as an "individual" subject to certain reporting requirements under OAR 461-165-0180. Specifically, in the event of Stephens-Bontemps's arrest, petitioner would be required to report that arrest to the Direct Pay Unit within five days of its occurrence. *See* OAR 461-165-0180(7)(h)(A) ("Each provider must * * * [r]eport to the [DHS] Direct Pay Unit within five days of occurrence: (A) Any arrest or conviction of any subject individual or individual described in * * * this rule."). Stephens-Bontemps was aware of that reporting requirement.

On August 2, 2016, a Multnomah County grand jury indicted Stephens-Bontemps on charges of theft, forgery, conspiracy, and unlawfully obtaining public assistance. Stephens-Bontemps learned of the indictment the next day through one of her employees. In response, Stephens-Bontemps arranged through counsel to voluntarily appear for arraignment on the indictment in Multnomah County Circuit Court. On August 5, 2016, she voluntarily appeared in court as scheduled. At the conclusion of that appearance, Stephens-Bontemps entered into a "Release Order and Agreement," which included preprinted language requiring her to appear at all future hearings, obey all laws and court orders, not leave the State of Oregon without the court's permission, and comply with any other conditions imposed by the court in the agreement. The court added the following additional condition: "book and release TSI [(Turn Self In)] per MCSO [(Multnomah County Sheriff's Office)]." The book-and-release process required Stephens-Bontemps to be officially photographed and fingerprinted at the sheriff's office.

Following her arraignment, Stephens-Bontemps left the courtroom accompanied only by her husband and walked directly to the sheriff's office, where she notified the receptionist that she was there for booking. Stephens-Bontemps then waited in the lobby until her name was called. After she had been photographed and fingerprinted as directed, Stephens-Bontemps returned home with her husband. At no point was Stephens-Bontemps physically restrained, formally taken into custody, or told that she could not leave

the sheriff's office. Instead, she could have left at any time. Stephens-Bontemps did not report to the Direct Pay Unit that she had been arrested.[3]

On August 31, 2016, DHS issued an amended suspension notice to petitioner through Stephens-Bontemps notifying her that, effective that same day, petitioner's business would no longer be eligible for subsidy payments due to its failure to notify the Direct Pay Unit of her arrest on August 5, 2016.[4] Petitioner requested a contested hearing, and DHS referred the case to the Office of Administrative Hearings for an administrative law judge (ALJ) to conduct a contested-case hearing.

In its final order, DHS reasoned that the payments should be terminated if the evidence demonstrated that Stephens-Bontemps had been arrested "in the context of the meaning of [that] term in OAR 461-165-0180(7)(h)." The final order provided DHS's understanding of that context:

"[DHS] interprets OAR 461-165-0180 and its use of the term 'arrest' *in the context of its need to know whether an event has occurred that triggers a weighing test to review whether a provider should remain in approved status for ERDC clients*; in other words, whether a review should occur about the continuation of a provider of child care with public subsidy funds. * * * *Not reporting an arrest as required interferes with the ability of [DHS] to promote the safety of children*."

(Emphases added.) DHS thus concluded that the release agreement, specifically the condition that Stephens-Bontemps be booked and released by turning herself in to the sheriff's office, triggered the reporting requirement of OAR 461-165-0180(7)(h)(A) "to assure provider review through the application of the weighing test."

---

[3] This finding of fact, which the administrative law judge did not make, but petitioner argues was added by DHS pursuant to ORS 183.650(3), *is* disputed by petitioner. As we explain below, however, 302 Or App at 330 n 6, petitioner's challenge is based on its legal argument that DHS misconstrued the term "arrest," and not the evidentiary sufficiency of the record to support a finding that no report was made.

[4] As a result of petitioner's suspended status, petitioner was ineligible for ERDC payments for six months. At the conclusion of that period of ineligibility, petitioner would be eligible for payments only if approved following reapplication to DHS. OAR 461-165-0180(2)(c)(C).

DHS considered, but rejected, petitioner's assertion at the hearing that the definition of "arrest" in ORS 133.005 controlled the agency's analysis and established that Stephens-Bontemps had not been arrested. In that statute, which is part of the criminal code, the legislature has defined "arrest" as "to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense."[5] ORS 133.005(1); *see also id.* (specifically excluding a "stop," as defined elsewhere, from the definition of arrest). DHS concluded that ORS 133.005 did not control, because that statute specifically provides that the definitions found there apply to the defined terms "[a]s used in ORS 133.005 to 133.400 and 133.410 to 133.450, unless the context requires otherwise." In DHS's view, a definition of "arrest" found in the criminal code could not provide context for its construction of an administrative notification requirement in its own rules, because that requirement was not a matter of criminal procedure. In any event, DHS concluded, even if the definition of "arrest" in ORS 133.005(1) and the case law construing that term somehow controlled, Stephens-Bontemps had been arrested, because the book-and-release process had had the effect of placing her in constructive restraint or custody.

In concluding that the case law supported its interpretation of "arrest," DHS purported to distinguish the facts of petitioner's case from those in various appellate decisions addressing restraint and custody in the criminal law context. For example, DHS acknowledged that, in *State v. Davis*, 360 Or 201, 206, 377 P3d 583 (2016), the Supreme Court defined constructive restraint in the context of ORS 162.145 (third-degree escape from custody) to occur "when *an officer* lawfully asserts authority to control a person's actions or freedom of movement, even if the officer does not have physical control of the person," which had not occurred in petitioner's case. (Emphasis added.) DHS

---

[5] The Supreme Court has concluded that "the legislature did not intend the qualifying phrase 'for the purpose of charging that person with an offense' to limit the clause 'place a person under actual or constructive restraint.'" *State v. McClure*, 355 Or 704, 713-14, 335 P3d 1260 (2014) (detention on parole warrant constituted an "arrest").

concluded, however, that the *Davis* decision was "generally not relevant" to petitioner's case, because *Davis* involved an alleged escape from custody. DHS also distinguished another case, *State v. Ford*, 207 Or App 407, 410, 412, 142 P3d 107 (2006), in which we concluded that the defendant— who had not been booked—had not been "'released from custody'" for purposes of a related failure-to-appear charge. (quoting ORS 162.205(1)(a)). According to DHS, *Ford* was readily distinguishable because, unlike the defendant in that case, Stephens-Bontemps *was* booked after her arraignment. The final order thus affirmed the suspension of petitioner's ERDC subsidy payments.

On judicial review, petitioner assigns error to DHS's interpretation of the term "arrest" in the final order. Specifically, petitioner argues that Stephens-Bontemps was not subject to an "arrest" as that term is defined under Oregon law, therefore the failure to report an arrest to the Direct Pay Unit could not have violated the requirements of OAR 461-165-0180.[6] Petitioner maintains that ORS 133.005(1) sets forth the generally understood meaning of "arrest" under Oregon law, and that our decision in *Ford* demonstrates that Stephen-Bontemps was not arrested. Therefore, petitioner argues that we should construe OAR 461-165-0180(7)(h)(A) consistently with ORS 133.005(1) and

---

[6] Petitioner also argues that DHS erroneously modified the ALJ's finding of historical fact by adding a finding that Stephens-Bontemps failed to report that she had been arrested on August 5, 2016. In essence, petitioner argues that, because that finding is premised on the understanding that, by being booked and released, Stephens-Bontemps was "arrested"—an understanding that petitioner contends has no basis in law—there likewise is no basis in fact to support that finding. *See* ORS 183.650(4) ("[I]f a party seeks judicial review of an agency's modification of a finding of historical fact under subsection (3), *** the court shall make an independent finding of the fact in dispute by conducting a review de novo of the record viewed as a whole."); *Weldon v. Bd. of Lic. Pro. Counselors and Therapists*, 266 Or App 52, 63, 337 P3d 911 (2014), *rev den*, 356 Or 690 (2015) (Any petitioner requesting *de novo* review pursuant to ORS 183.650(4) must "specifically identify each challenged modification of a finding of historical fact and explain why that modification was erroneous as unsupported by a preponderance of the evidence." (Internal quotation marks and emphasis omitted.)). However, in this case, the question whether Stephens-Bontemps was arrested "is a legal issue and any modification of the proposed order's conclusions on that issue was not a modification of the ALJ's findings of historical fact." *Shicor v. Board of Speech Language Path. and Aud.*, 291 Or App 369, 376, 420 P3d 638 (2018) (internal quotation marks omitted). Accordingly, we do not separately consider petitioner's factual challenge.

*Ford*. With the rule correctly interpreted in that way, petitioner contends, there is no basis in law for DHS's conclusion that the rule required petitioner to report that Stephens-Bontemps had been arrested. Stated in terms of our standard of review, DHS's ruling terminating petitioner's ERDC subsidy payments is, petitioner argues, based upon an erroneous interpretation of OAR 461-165-0180, an interpretation to which we cannot defer because it is not plausible.[7]

DHS, in turn, asserts that its interpretation—that, on August 5, 2016, Stephens-Bontemps was arrested within the meaning of OAR 461-165-0180(7)(h)(A)—is plausible and warrants our deference because it is consistent with both the text of the rule and its context. Citing the definition of "arrest" found in *Webster's Third New Int'l Dictionary*, DHS argues that "[t]he ordinary meaning of 'arrest' includes the 'legal restraint of a person.'" Thus, although DHS concedes that Stephens-Bontemps was never physically restrained in the course of her arraignment and subsequent completion of the book-and-release process, DHS maintains that she nonetheless was "arrested," because the court's order directing her to complete that process subjected her to "legal restraint"; that is, Stephens-Bontemps necessarily was at least under some form of *constructive* restraint, otherwise there would have been nothing from which to "release" her. DHS further argues that the context of the rule supports its interpretation of "arrest" because the rule and related subsections reflect the agency's need for information "that might implicate the safety of children in a provider's care." *See e.g.*, OAR 461-165-0410(2) (criminal history of a subject individual that may jeopardize the safety of, or have detrimental effect on, children in a provider's care may render provider ineligible for payment).

DHS alternatively argues that, even if the criminal code definition of "arrest" controls, its conclusion that Stephens-Bontemps was arrested remains correct because of the court-ordered book-and-release process to which she

---

[7] Petitioner's argument that DHS erroneously and implausibly interpreted its rule is the lone basis on which petitioner requests relief. Petitioner does not contend that relief is otherwise warranted based on a lack of fair notice or other due process violation, nor does petitioner suggest that DHS's interpretation of its rule raises such constitutional concerns.

was subjected.[8] Citing our decision in *State v. McColly*, 286 Or App 168, 399 P3d 1045 (2017), *rev'd on other grounds*, 364 Or 464, 435 P3d 715 (2019), DHS disputes petitioner's reliance on *Ford*, because, unlike the defendant in *Ford*, Stephens-Bontemps was booked, "and that distinction makes all the difference." DHS argues that our decision in *McColly* generally stands for the proposition that the book-and-release process constitutes constructive restraint and therefore is the equivalent of being placed in custody and arrested.[9]

We review DHS's interpretation of its own administrative rules for legal error. *Boatwright v. Dept. of Human Services*, 293 Or App 301, 304, 425 P3d 449 (2018). In interpreting OAR 461-165-0180(7)(h)(A), "we seek to divine the intent of the rule's drafters, employing essentially the same framework that we employ when interpreting a statute." *Noble v. Dept. of Fish and Wildlife*, 355 Or 435, 448, 326 P3d 589 (2014) (citing *State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010)). "Under that analytical framework, we consider the text of the rule in its regulatory and statutory context." *Noble*, 355 Or at 448. *See also Oil Re-Refining Co. v. Environmental Quality Comm.*, 361 Or 1, 14, 388 P3d 1071 (2017) (noting that the context of an administrative rule includes other provisions of the same rule, other related rules, and related statutes).

Our interpretation of administrative rules departs from our approach to statutory interpretation in one notable respect: When, as here, an agency has interpreted its

---

[8] To the extent that DHS's argument can be understood to be that the mere issuance of a court order constituted an arrest under that criminal standard, we reject it. The criminal code establishes who may make an arrest, and the relevant provision excludes courts. ORS 133.220. Thus, although judges certainly have the authority to issue warrants for arrest, ORS 133.120, neither that act alone—nor the issuance of an order directing a person to submit to custody—can reasonably be viewed as making an arrest.

[9] We decided *McColly* after DHS issued its final order in this case. As DHS points out, in that case we held that, in the context of the failure to appear statute, ORS 162.195, the defendant's circumstances constituted having been "'released from custody,'" because she had been booked after voluntarily appearing for an arraignment. 286 Or App at 171-72 (quoting ORS 162.195). After briefing was complete in this case, the Supreme Court issued its decision reversing our opinion in *McColly. State v. McColly*, 364 Or 464, 435 P3d 715 (2019). We discuss below the continuing relevance of our decision in that case.

own rules, "we give significant deference to that interpretation and are required to affirm it if it is 'plausible,' that is, if it is not inconsistent with the wording of the rule itself or with the rule's context, or with any other source of law." *Boatwright*, 293 Or App at 304-05 (applying the Supreme Court's analytical framework in *Don't Waste Oregon*[10] to reject as implausible DHS's interpretation of own rule due to inconsistency with text of rule as understood in its context); *see also Pena v. Travelers Ins. Co.*, 294 Or App 740, 745, 432 P3d 382 (2018), *rev den*, 364 Or 723 (2019) (noting that the plausibility inquiry itself applies "the same principles of interpretation that are used to construe statutes"). If, following that inquiry, we determine that DHS's interpretation is plausible, then we must defer to that interpretation. *See AT&T Corp. v. Dept. of Rev.*, 357 Or 691, 712, 358 P3d 973 (2015). For the reasons that follow, we conclude that DHS's proffered interpretation is plausible and requires our deference.

We begin our inquiry with the disputed term itself: "arrest." DHS's administrative rules do not define "arrest." Thus, as a general rule, we would assume, "at least initially, that the word ['arrest'] *** has its plain, natural, and ordinary meaning." *DCBS v. Muliro*, 359 Or 736, 746, 380 P3d 270 (2016) (internal quotation marks omitted); *see Pena*, 294 Or App at 745 (Regulatory terms "should be given their plain, natural, and ordinary meaning unless specifically defined or used in some other way." (Internal quotation marks omitted.)). And, to determine a word's ordinary meaning, we consult standard dictionary definitions of "arrest," as DHS does in this case. *See State v. Walker*, 356 Or 4, 14, 333 P3d 316 (2014) (observing that a word's dictionary definition likely reflects the legislature's intended meaning). Here, however, the word "arrest" can only be viewed as "a term of art, drawn from [the] specialized field" of criminal law. *State v. McNally*, 361 Or 314, 322, 392 P3d 721 (2017). That is, even though DHS disputes the relevance of the definition of

---

[10] *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (providing that, when an agency has interpreted one of its own rules, courts will defer to the agency's interpretation if that interpretation is plausible and is not inconsistent with the rule in its context or with some other source of law).

arrest in the criminal code, it acknowledges that the reporting requirement at issue is intended to ensure that DHS is apprised when a subject individual's *criminal* history potentially threatens the safety or wellbeing of children. *See also* OAR 461-165-0410(2) (permitting DHS to terminate ERDC payments under those circumstances). Thus, we look to the usage of that term in its specialized field; further, because "arrest" is a *legal* term of art, we specifically consult legal dictionaries to understand its "established legal meaning." *McNally*, 361 Or at 322; *see also Davis*, 360 Or at 207 (citing legal definition of "arrest" found in *Black's Law Dictionary* as its "ordinary meaning").

As it turns out, the legal and common definitions of "arrest," at least as DHS uses that word in its rule, largely overlap. For example, *Webster's* defines "arrest" as "the taking or detaining of a person in custody by authority of law" or the "legal restraint of the person." *Webster's* at 121 (unabridged ed 2002). *Black's*, in turn, defines that term as "seizure or forcible restraint, esp. by legal authority *** [or] [t]he taking or keeping of a person in custody by legal authority, esp. in response to a criminal charge." *Black's* at 130 (10th ed 2014). Central to each definition is some degree of "restraint." *See Webster's* at 121 ("taking or detaining *** in custody" or "legal restraint"); *Black's* at 130 ("seizure or forcible restraint" or "taking or keeping *** in custody"). And, although we question whether, as DHS suggests, *Webster's* reference to "legal" restraint *necessarily* encompasses "constructive" restraint, neither the *Webster's* nor the *Black's* definition of "arrest" precludes that understanding of the term or otherwise renders DHS's interpretation implausible.

For further guidance as to whether "arrest" can plausibly be understood to encompass both constructive restraint and, more specifically, the book-and-release process to which Stephens-Bontemps was subjected, we look to the broader context of criminal law for any light it might shed on the intended meaning of OAR 461-165-0180 (7)(h)(A). At the outset of that inquiry, we note that we need not determine whether the criminal code definition of "arrest," provided in ORS 133.005, is controlling authority, as petitioner suggests. Instead, we apply that definition here

only insofar as it informs our understanding of the ways in which the word "arrest" is used in the field of criminal law as a whole and whether, in turn, that understanding supports the plausibility of DHS's interpretation. Contrary to petitioner's position, we conclude that it does.

Under ORS 133.005,

> "'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense. A 'stop' as authorized under ORS 131.605 to 131.625 is not an arrest."

ORS 133.005(1). Thus, under that statute, at least, the term "arrest" encompasses the notion of "constructive restraint," as well as at least one form of "custody." *See also State v. Bolden*, 104 Or App 356, 359 n 3, 801 P2d 863 (1990), *rev den*, 311 Or 166 (1991) (noting that, under the criminal code, the terms "custody" and "arrest" are often used interchangeably and, admittedly, circularly, with provisions in the criminal code defining "custody" in terms of an "arrest" and vice versa (citations omitted)). We, therefore, turn to case law construing *those* terms for further guidance as to how the term "arrest" is understood in the field of criminal law.[11]

As noted, both parties cite our decision in *Ford* to provide such guidance. In *Ford*, we considered whether the defendant could be prosecuted for first-degree failure to appear under ORS 162.205(1)(a) and, specifically, whether a release agreement that he had signed following a voluntary court appearance had released him "from custody" within the meaning of the failure-to-appear statute.[12] 207 Or App at 409-10. Recognizing that, under ORS 162.135(4),

---

[11] We recognize that, by considering how terms such as "constructive restraint" and "custody" have been construed in the case law, our analysis becomes increasingly attenuated from the issue immediately at hand, which is how the term "arrest" is understood in the field of criminal law. However, given our deferential standard of review, our task is not to determine how we ultimately would construe that term, but, rather, whether DHS's understanding of how the term is used in the field it comes from is "plausible." Accordingly, we consider case law construing terms that have been equated with "arrest," whether or not we would equate them under the same circumstances.

[12] As relevant here, the failure to appear provision under which the defendant was charged requires proof that the person fails to appear in court as required after "[h]aving by court order been *released from custody* *** under a release agreement." ORS 162.205(1)(a) (emphasis added).

"custody" requires a showing that the person is subject to "actual or constructive restraint by a peace officer pursuant to an arrest or court order," the state argued, among other things, that the defendant had been "subject to constructive restraint *by a court*" when he signed the release agreement at his voluntary appearance. *Id.* at 410 (emphasis in original; internal quotation marks omitted). We rejected the state's argument. *Id.* at 412. We explained that "defendant was neither arrested, nor did the court order him taken into custody." *Id.* (noting that the voluntary appearance process gave the defendant an opportunity to *avoid* the issuance of a warrant for his *arrest* and that he had complied with that process). Here, petitioner notes the similarities between the circumstances of Stephens-Bontemps and those of the defendant in *Ford*, suggesting that those circumstances cannot be viewed as "custody," much less as an "arrest."

As DHS points out, however, we also observed in *Ford* that there was "no evidence that [the defendant] was 'booked' or otherwise taken into custody at the initial hearing before his release." *Id.* And, although that observation arguably was *dictum* in *Ford*, that distinction formed the basis for our subsequent holding in *McColly* that a similarly situated defendant *had* been released from "custody" within the meaning of ORS 162.135(4). *McColly*, 286 Or App at 172 (noting that, unlike in *Ford*, the record in *McColly* indicated that the defendant "went through the booking process"). As we explained in *McColly*,

> "Although the record is sparse, the record contains evidence that the trial court released defendant based on a 'conditional release' and ordered defendant to complete the 'book and release' process that same day. The book and release process is 'the official process of being fingerprinted and photographed by the deputies.' Defendant executed the conditional release agreement, and swore to that conditional release before a clerk."

286 Or App at 172 (brackets omitted). Based on that difference in the evidence, we concluded that

> "there was sufficient evidence for a jury to find that defendant was placed in constructive [restraint] of a peace officer

for the booking process. Thus, the state presented sufficient evidence that defendant was released from 'custody' under a release agreement as required by ORS 162.195.[13]"

*Id*. Although the Supreme Court ultimately reversed our decision in *McColly*, our decision in that case nonetheless supports the conclusion that DHS's interpretation of "arrest" is plausible. In our decision in *McColly*, we held that the booking process, at least as described in that case, constituted constructive restraint, and therefore custody, either of which arguably constitutes an arrest under ORS 133.005(1). *Id*. at 172. When the Supreme Court reversed that decision, it did so on related, but distinct grounds that left our reasoning intact without resolving whether we were correct. *State v. McColly*, 364 Or 464, 488, 435 P3d 715 (2019) (holding that the state did not prove that the defendant had been released *from* custody, because the evidence showed that the defendant had been released *before* completing the booking process; thus, that process could not serve as the "custody" from which the defendant was released). In reaching that conclusion, the Supreme Court expressly declined to address whether "the book-and-release process itself qualified as 'actual or constructive restraint imposed by a peace officer.'"[14] *Id*. at 486 n 22 (quoting ORS 162.135(4)). Given the absence of any clear indication from that court that the interpretations of the terms "constructive restraint" and "custody" in our own opinion were erroneous, much less implausible, we are not inclined to draw that conclusion ourselves. And, given that at least one definition of "arrest" under our criminal law—that found in ORS 133.005(1)—defines "arrest" in terms of "constructive restraint" and "custody," we cannot conclude that DHS's interpretation of that term as used in OAR 461-165-0180(7)(h)(A) is implausible.

---

[13] ORS 162.195 defines the offense of second-degree failure to appear and, as relevant here, requires a showing that a person has been released "from custody" by a court under a release agreement. As noted, ORS 162.135(4) defines "custody" as including the imposition of "constructive restraint" by a peace officer.

[14] We note, however, that, in summarizing the facts of the case, the Supreme Court explicitly observed that, after the defendant completed the book-and-release process, "she had not been released following *arrest*, detention, or confinement." *McColly*, 364 Or at 466 (emphasis added). Although that may appear to support the argument that the booking process cannot constitute an arrest, that articulation, without further analysis, does not affect our conclusion.

In reaching that conclusion, we emphasize that we are not, strictly speaking, construing ORS 133.005(1) or any other statutory definition of "arrest," "custody," or "constructive restraint"; rather, we are merely considering how those terms are understood under our criminal code and decisional law as a means of evaluating whether DHS's understanding of its own rule is plausible. It may well be that, faced with the task of construing "arrest" in ORS 133.005(1) or elsewhere in the criminal code, we would conclude that, although an arrest may encompass custody, constructive restraint, or both, those three terms are not coextensive, as DHS applies them here. *Cf. Davis*, 360 Or at 209-10 (observing that, although the evidence was sufficient to establish that officers had placed the defendant under constructive restraint, it could not support a finding that it had been pursuant to an arrest). Here, however, neither that possibility, nor the likely presence of other plausible interpretations, compels the conclusion that DHS's interpretation of OAR 461-165-0180(7)(h)(A) is implausible. Thus, deferring, as we must, to DHS's plausible interpretation of its own rule, we affirm.

Affirmed.